USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  6/16/20

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------X
UNITED STATES OF AMERICA,             :
                                      :
                                      :          **19 CR 0097(VM)**
        -against-                     :
                                      :          **DECISION AND ORDER**
ABRAHAM HERNANDEZ,                    :
                                      :
                   Defendant.         :
-------------------------------X
**VICTOR MARRERO, U.S.D.J.:**

     Defendant Abraham Hernandez ("Hernandez") is charged

with one count of possession of child pornography, in

violation of 18 U.S.C. Sections 2252A(a)(5)(B) and (b)(2).

Hernandez now moves, pursuant to the Fourth Amendment and

Rule 12 of the Federal Rules of Criminal Procedure, for an

order suppressing certain evidence (the "Motion," Dkt. No.

14). Specifically, Hernandez challenges: (1) police

officers' initial warrantless entry into his apartment on

November 7, 2018, the ensuing search and securing of his

apartment, and all evidence that is the fruit of those

actions; (2) the warrantless search of Hernandez's Kik[1]

account information, and (3) a later federal search warrant

(the "Warrant") and all evidence stemming from the Warrant.

(See "Memorandum," Dkt. No. 15.)

     After receiving the Government's memorandum in

opposition to the Motion on June 10, 2019 ("Opposition,"

---

[1] Kik is a social messaging application.

Dkt. No. 17), the Court held oral argument on the Motion on September 6, 2019. At the Court's instruction, oral argument focused on Hernandez's challenges to the New York City Police Department's ("NYPD's") initial entry into his apartment, the ensuing search, evidence that is the fruit of that entry and search, and the later Warrant.

Based on the motion papers and oral argument, the Court concluded that the Motion turned on disputed issues of fact -- in particular: whether Hernandez's mother voluntarily consented to the police officers' initial entry and search of the apartment; whether exigent circumstances justified the officers' initial entry and search of the apartment; whether the affidavit submitted to the magistrate judge by federal agents in support of the search warrant application contained material deliberately or recklessly false statements or omissions; and whether probable cause existed for Hernandez's arrest. Accordingly, the Court held an evidentiary hearing to address these issues.

For the reasons set forth below, the Court DENIES the Motion.

## I.   FACTUAL BACKGROUND[2]

A.   THE NYPD INVESTIGATION

### 1.   The Tip

The case against Hernandez originated when an NYPD-registered confidential informant provided a tip to the NYPD. In text messages sent on November 4 and 5, 2018, the informant told her NYPD handler, Officer Jennings ("Jennings"), that she knew an adult male who was engaging in sexual activities with his underage sister and his sister's 13-year-old friend. She informed Jennings that the man sent her videos of him engaging in sexual activities with the 13-year-old. The informant provided the man's building address but said that she had forgotten his apartment number. She stated that she did not know his legal name.

Around 6:00 p.m. on November 6, 2018, Jennings conveyed this information to NYPD Detective Anthony Lofaro ("Lofaro"). In a text message to Lofaro, Jennings explained that the informant insisted she did not want to be paid for

---

[2] The factual recitation that follows derives from the transcripts of the hearing held on November 26, 2019 and January 7, 2020 ("Nov. 26 Tr." and "Jan. 7 Tr.") and the exhibits admitted in evidence at that hearing as well as the pleadings and motion papers on the public record. No further citations to these sources will be made herein except as specifically cited. While the Court has reviewed and considered all of the live testimony and accompanying exhibits admitted in evidence in connection with the hearing in this matter, the Court addresses only those portions of the evidence relevant to its legal conclusions.

providing information but that Jennings would nonetheless pay her. He asked Lofaro to keep him apprised of how the informant assisted the investigation so that Jennings could compensate her.

Lofaro felt an urgent need to locate the 13-year-old the informant had referred to. At around 8:15 p.m. on November 6, Lofaro met with the informant in Queens. The informant showed Lofaro the Kik messages, videos, and photos she received from the man she had described to Jennings and who used the Kik username Armanixprincex and the Kik display name Armani Prince. Lofaro recalled that the room in some of the videos featured floral bedding. According to Lofaro, the informant claimed that she recognized the background of one video as the Kik user's apartment and recognized the penis in the videos as the Kik user's penis.[3] After showing Lofaro the content on her phone, the informant sent the videos, photos, and screenshots of the Kik messages to Lofaro's work phone. In Lofaro's view, the informant "seemed disgusted" and reported the conduct because she "thought that it was wrong" and not because she wanted payment for the information. Nov. 26 Tr. at 164:24-165:9; 166:11-19. When

---

[3] Lofaro did not include this information in the three reports he made regarding statements by the informant. See Def.'s Exs. 3505-15, 3505-16, 3505-17.

Lofaro reviewed the messages on the informant's phone, he viewed them as evidence of ongoing criminal activity. As he testified, his first impression of the messages was that they were "concerning because we had a 13-year-old female that was being raped." Nov. 26 Tr. 167:12-15. However, Lofaro did not explain why he believed the potentially criminal activity the informant had reported was ongoing.

### 2. The Kik Messages

The Government produced the screenshots the informant sent to Lofaro, who was not aware of anyone from the NYPD extracting the messages or other data from the informant's phone. It is not clear when the messages depicted in the screenshots were sent. One of the screenshots depicts timestamps generated by the Kik application: "Yesterday 12:14 PM . . . Yesterday 1:42 PM . . . Yesterday 10:39 PM . . . [Today] 3:39 AM[.]" Gov.'s Ex. 4, at 125. These timestamps indicate only that some of the messages were sent the day before and the day on which the informant took the screenshots. Because the Government did not offer evidence of when the screenshots were taken, the Court cannot infer the date of the messages from the timestamps.[4] When asked if the informant sent Lofaro the screenshots

---

[4] Special Agent Leslie Adamczyk ("Adamczyk") of the Federal Bureau of Investigation ("FBI") testified that she did not know how long before November 7, 2018 the Kik messages were sent.

while he was still meeting with her, Lofaro responded, "I don't know exactly." Nov. 26 Tr. 210:17-19.[5]

Lofaro considered the messages to be consistent with what the informant told him. In the messages, the Kik user repeatedly represented that the photos and videos depicted him engaging in sexual activities with a 13-year-old friend of his 12-year-old sister. The Kik user represented that he began having sex with the 13-year-old in the summer of 2018 and that they engaged in sexual activities a "couple times" when she was spending the night with his sister. Gov.'s Ex. 4, at 128, 132. In addition, the Kik user told the informant that he had a video of his sister with the 13-year old and sent the informant a video depicting two underage girls engaging in sexual activities.

Although the messages make clear that the 13-year-old was not always at the Kik user's residence, the Kik user indicated that she would return for sleepovers in the future. On one occasion when she was not at the Kik user's residence, the Kik user stated that he could "see if she[would] come" over. See id. at 114. The Kik user also represented that, if the informant wanted to engage in sexual activities with the 13-year-old, he could arrange

---

[5] Additionally, the screenshots, as produced by the Government, do not present the conversation between the Kik user and the informant in chronological order. For example, there appears to be overlap between messages on the second and fourth pages of Government Exhibit 4.

it.  The Kik user suggested that he, the informant, and the 13-year-old have a "threesome."  See, e.g., id. at 118, 132.

The messages were consistent with the informant's claims that she had seen the Kik user in person and had seen his apartment.  At one point the informant said that, if the Kik user wanted her to come over, she could "get a ride," and the Kik user replied "Yeah come."  Id. at 116. The Kik user repeatedly invited the informant to his residence and referred to the possibility of having sexual relations with the informant.  The Kik user and informant also used terms of endearment when speaking to one another. The Kik user referred to the informant as "sweetie," "love," "boo," and "bby."  See id. at 118, 123, 125, 130. The informant similarly called the Kik user "baby."  See id. at 124.

At one point during the Kik exchange, the informant sent the message "U," followed by a screenshot of an account on the dating site MeetMe with the display name ArmaniPrince.  See Gov.'s Ex. 4, at 129.  The MeetMe profile featured a profile picture and described the user as a 27-year-old male residing in the Bronx.  At the time the screenshot was taken, the ArmaniPrince MeetMe profile indicated that the user's current geolocation was Mott Haven, New York, the neighborhood where the apartment

building that the informant identified is located. When the informant asked, "That u on MeetMe[?]," the Kik user replied, "Yeah sweetie." Id. at 130. Consistent with the Kik user and informant having interacted before, the Kik user then wrote, "Now u remember lol," to which the informant responded, "Yes." Id.

The messages however, do raise some ambiguity about the claim that the informant believed the Kik user to be the person shown in the videos who was engaging in sexual activities with minors. For example, the informant messaged the Kik user, "That not u [with] her." Id. at 116.

Nor are the messages entirely consistent with the claim that the informant was concerned about the Kik user's behavior. In fact, in other parts of the Kik conversation, the informant requested videos of the Kik user engaging in particular sexual activities with the 13-year-old. The informant also indicated that she wanted to be present at the Kik user's apartment while he engaged in sexual activities with the 13-year-old, stating, "Yo when she comes back to your crib to sleep lol I want to see this / We can smoke and have some drinks." Id. at 117.

3.   The NYPD's Social Media and Database Searches

Around 8:30 p.m. on November 6, 2018, NYPD Officer Wonjin Noh ("Noh") conducted Google searches based on the

username, display name, and profile picture associated with
the Kik account at issue here. From the searches he
conducted, Noh identified social media accounts, including:

1. A Plenty of Fish account for "ArmaniPrince90" that
   described the user as a 28-year-old male standing
   five feet, seven inches tall, whose astrological
   sign is Leo, and who lives in the Bronx;

2. An Instagram account for @Swayzeejay with the
   display name "AJ Hernandez" that referenced
   another social media account with the username
   "armani_prince"; and

3. A Facebook account for "AJ Hernandez" from the
   Bronx with the custom Uniform Resource Locator
   ("URL") https://www.facebook.com/SwayZeeJay.[6]

Def.'s Ex. 3508-01, 3508-02. Public photographs associated
with the accounts appeared to depict the same individual as
the profile picture associated with the MeetMe account
described above.

Using a database accessible to the NYPD, Noh identified
a photograph and information about a person named Abraham
Machuca Hernandez whose appearance matched that of the
person depicted in the social media photos Noh identified.
Noh's search also revealed that Abraham Machuca Hernandez
had a Pennsylvania driver's license.

Through another database, Noh identified a specific
apartment in the building identified by the informant that
was associated with someone with the surname Hernandez.

---

[6] The Court takes judicial notice of the fact that Facebook allows users
to customize the URLs for their profiles.

Noh's reports, which the Government produced, do not provide detail regarding the time period of that association.[7]

B.   THE NOVEMBER 7, 2018 WARRANTLESS ENTRY

Around 12:25 a.m. on November 7, 2018 -- approximately four hours after Lofaro met with the informant -- Lofaro and other NYPD officers went to the apartment that Noh identified based on the street address the informant provided. The officers did not have a warrant to arrest Hernandez or a warrant to search the apartment. According to Lofaro, they did not obtain a warrant before going to the apartment because they were concerned about locating the 13-year-old girl as quickly as possible. Lofaro conceded that the officers did not have the permission of Hernandez or his mother to enter the building and could not recall how they gained access to the building. He testified that the officers planned to gain access to the apartment by knocking on the door and requesting permission to enter. He explained that he and his captain discussed "possibly getting an exigent circumstance to enter the apartment" in the event they did not receive consent to enter. Nov. 26 Tr. 170:14-19.

---

[7] Noh's report stated the he "conducted Das Lite computer checks with the last name 'Hernandez' who resides at [the building address provided by the informant]." Def.'s Ex. 3508-01. Lofaro said that he could not testify to details about Noh's searches.

At the time the officers arrived at the apartment door, Hernandez was home with his mother, Elexida Hernandez ("Ms. Hernandez"), who also resides in the apartment. Aside from Hernandez and his mother, no one else lives in the apartment. Ms. Hernandez has one other child: an adult daughter who lived in Virginia as of November 2018.

Ms. Hernandez is sixty-six years old and has lived in New York for thirty-five years. She attended school in the Dominican Republic through the tenth grade, and she testified that she has only a limited understanding of English. Ms. Hernandez has never been arrested, and police never before searched her home. She suffers from nervous problems, arthritis, and high blood pressure, and lives on Social Security Disability Benefits. She receives assistance from home attendants, who visit her home three times a week for four hours. As of November 2018, Ms. Hernandez was recovering from two surgeries that she had in the preceding two-and-a-half months.

The parties dispute what happened when the NYPD arrived at the Hernandez's door. Ms. Hernandez remembered hearing a loud knock on the door, which scared her. She testified that when she went to see who was at the door, a man "told [her] to open the door," and that, when she asked who he was, the man said he was a detective. Id. at 27:13-

11

25. Ms. Hernandez understands the word detective. Although the officer who spoke to her was in plain clothes, she recognized others with him as police because they were wearing uniforms. She recalled seeing more than six officers at her apartment. She testified that she asked the officer what happened, he responded by asking if Hernandez lived there, and she confirmed that he did. According to Ms. Hernandez, she again asked the officer what was happening, and he said, "[w]e want to ask you some questions." Id. at 27:23-28:2. She then opened the door. She testified that once she opened the door, the officer asked where Hernandez's room was, and she "showed him." Id. at 28:2-7. She explained that an officer then entered the apartment and "took" Hernandez out. Id. According to Ms. Hernandez, the officers never requested permission to enter, and she did not know that she had the right to deny them access.

Lofaro testified that he, his captain, and at least two other officers went to the apartment. According to Lofaro, his captain knocked loudly on the apartment door, the officers identified themselves as police, and Ms. Hernandez opened the door. Lofaro believed the officers were all wearing suits and that some of the officers were carrying guns, which they kept holstered. He confirmed that

no one spoke to Ms. Hernandez in Spanish before the officers entered. He testified that his captain said something to Ms. Hernandez in English but that he could not recall exactly what his captain said. According to Lofaro, Ms. Hernandez made a gesture that he interpreted as indicating that she was allowing the officers to enter the apartment.[8] Lofaro did not interpret anything he observed as indicating that the officers were unwelcome.

Upon entering, the officers saw no minor, no bedrooms besides those of Hernandez and Ms. Hernandez, and no obvious criminal activity. However, Lofaro noticed bedding in Ms. Hernandez's room that he believed to be a potential match to the bedding in the videos. Lofaro knocked on the door to Hernandez's bedroom, and Hernandez opened the door. Lofaro recalled that he then "asked [Hernandez] to step out into the hallway so [they] could speak," that Hernandez walked out of the apartment into the hallway, and that officers then handcuffed Hernandez in the hallway. Nov. 26 Tr. 171:1-2.[9] At the time the officers arrested Hernandez, Lofaro believed him to be the Kik user because Lofaro recognized Hernandez from the social media account photos

---

[8] Lofaro's report of the events also states that Ms. Hernandez "invited [the NYPD] into her apartment by opening the door and motioning us in." Gov.'s Ex. 7.

[9] Lofaro explained that if Hernandez had refused to walk outside, then Lofaro's captain would have been responsible for making a decision about whether to arrest Hernandez inside the apartment.

that Noh identified. Lofaro did not recall asking Hernandez at the time of the arrest whether he was, in fact, Abraham Hernandez.

Lofaro claimed that, because they lacked a warrant, the officers did not thoroughly search the apartment on November 7. They did, however, seize two phones,[10] and they looked around for the 13-year-old girl the informant had referred to. The officers showed Ms. Hernandez a picture of the two minors featured in the videos and asked if she knew them. They also looked for the minors throughout the building.

Ms. Hernandez asked the officers what was happening and why they were arresting her son when he had been at home all day. The officers told her that, because her son was of legal age, he would have to explain it to her himself.

C.   HERNANDEZ'S POST-ARREST STATEMENT

Some of the NYPD officers took Hernandez to a local precinct for questioning. They read Hernandez his rights under Miranda v. Arizona, 384 U.S. 436 (1966), before the interview and recorded the interview, which began at approximately 1:48 a.m. on November 7, 2018.

---

[10] The Government is not seeking to introduce evidence obtained from these seized phones.

D.   THE NYPD'S SECURING OF HERNANDEZ'S APARTMENT

Meanwhile, NYPD officers remained inside the Hernandez's apartment for approximately 39 hours until the FBI executed the Warrant around 4:30 p.m. on November 8. The officers intended to ensure that no one tampered with or removed anything from the bedrooms.  Lofaro referred to this as "safeguarding" and testified that it is standard police practice. Nov. 26 Tr. at 172:15-173:5.

The officers permitted Ms. Hernandez to access the common areas of the apartment but did not allow her to enter her bedroom without an escort. Ms. Hernandez confirmed that a Spanish-speaking officer was present during that time. Through the Spanish-speaking officer, she told the officers to leave, but they did not. The experience was distressing for Ms. Hernandez, and, on the night the officers arrived, she experienced a medical event that triggered the officers to call an ambulance for her. The following day, Ms. Hernandez called her sister-in-law, who agreed to come over to the apartment. Ms. Hernandez explained that, although the officers observed her making this call, they did not hear that Ms. Hernandez's sister-in-law planned to come to the apartment. When Ms. Hernandez's sister-in-law arrived, the officers, despite

some initial reluctance, allowed her to enter the apartment but instructed that, if she left, she could not return.

E.   THE NYPD'S SEARCH FOR A PROSECUTOR

While NYPD officers were safeguarding the apartment, Lofaro took steps to refer the case to a prosecutor. The Bronx District Attorney's Office did not take the case. Based on a conversation with a supervisor, Lofaro understood that the Bronx District Attorney's Office thought that the NYPD lacked evidence that the Kik messages described above originated in the Bronx and, accordingly, that jurisdiction would be more appropriate in Queens, where the messages were received. Lofaro spoke to a prosecutor he knew in Queens, but she said that her bureau did not handle such cases. He did not understand her response to indicate that the Queens District Attorney's Office would decline the case. Ultimately, the NYPD did not refer the case to the Queens District Attorney's Office because the FBI accepted the case.

F.   THE INFORMANT'S STATEMENT

Also on November 7, the informant made the following written statement in connection with her identification of a picture of Hernandez: "This is the guy sen [sic] me the pic and vide [sic] and we talk on kik and meetme app." Def.'s Ex. L.

16

G.   THE FEDERAL INVESTIGATION

Sometime after 7:00 p.m. on November 7, 2018 --
approximately nineteen hours after the NYPD arrested
Hernandez and began securing his apartment -- Lofaro spoke
with Adamczyk and Assistant United States Attorney Sarah
Mortazavi ("Mortazavi") by phone for approximately ten to
twenty minutes.

As of November 2018, Mortazavi had worked as an
Assistant United States Attorney for approximately seven
months. At that time, she was working in the General Crimes
Unit. Adamczyk was, and is, a member of the FBI's Child
Exploitation and Human Trafficking Task Force. Before
joining the FBI, she obtained a law degree and worked as a
prosecutor in Essex County, New Jersey for five years. In
her seven years at the FBI, she has not performed any legal
work.

During the call on the evening of November 7, Lofaro,
Adamczyk, and Mortazavi agreed that they would meet on the
morning of November 8 and that Lofaro would bring Hernandez
to their office. During their meeting on the morning of
November 8, Lofaro provided Adamczyk and Mortazavi the
videos, photos, and screenshots of messages sent through
the Kik account at issue, along with other relevant
information.

Lofaro testified that he provided Adamczyk and Mortazavi an accurate account of everything he knew about the case. He specifically confirmed that he told Mortazavi and Adamczyk that the NYPD conducted inquiries based on the Armani Prince Kik account that led them to Hernandez; that he believed the Armani Prince Kik account belonged to Hernandez; that NYPD officers entered Hernandez's apartment, seized phones, and were remaining inside the apartment to safeguard it; and that the Bronx District Attorney's Office and a prosecutor in the Queens District Attorney's Office declined the case.

Lofaro also testified to the limitations on his knowledge as of November 8, 2018. At that time, he did not know whether the informant had been paid for the information she provided. He also testified that he did not know any information regarding the informant's criminal history or whether she was engaging in any criminal activity when she provided the tip in this case.[11] Because the informant was registered, Lofaro believed that she had previously provided credible information. However, he did

---

[11] Lofaro testified that Jennings did not provide him with the informant's criminal history, but that, as an NYPD member, Lofaro could generate criminal history reports.

not know any specific information about why the informant was registered.[12]

Based on her initial review of the Kik conversation, Adamczyk was concerned for the safety of the Kik user's sister and the other minor appearing in the sexual activities shown in the videos. She also thought the videos appeared to be commercial child pornography. As used by law enforcement personnel, the term commercial child pornography refers to child pornography that appears similar to, or is, widely-distributed child pornography that investigators have encountered in previous investigations.

Commercial videos are not necessarily made in studios; they can be produced, for example, in bedrooms of private residences. Accordingly, Adamczyk believed that the videos could have been produced in Hernandez's apartment even if they were commercial child pornography. She testified that, without a warrant authorizing her to search the apartment, she could not confirm whether the videos were, in fact, made in Hernandez's apartment. Adamczyk also testified that she could not be certain that the Armanixprincex Kik

---

[12] Although Lofaro obtains search warrants "fairly frequently," he testified that he "did not know" whether the NYPD's Patrol Guide contains special procedures that apply when an informant provides information used to obtain a search warrant. Nov. 26 Tr. 192:25, 193:7-10.

account belonged to Hernandez. Although she believed that the account's profile picture was a photograph of Hernandez, she recognized that someone other than Hernandez could have created the account using Hernandez's photograph.

According to Mortazavi, the team felt that they needed to work quickly to draft a complaint and search warrant application. She explained that they wanted to draft a complaint as soon as possible because Hernandez had already been arrested. When initially asked why they felt a need to draft the warrant application quickly, she explained that they perceived a risk that evidence would be destroyed or tampered with, particularly if Hernandez was released on bail. She added that concerns about the minors shown in the videos also contributed to a sense of urgency.

The group decided that Adamczyk, rather than Lofaro, would sign the complaint and warrant affidavit. At the time that decision was made, Adamczyk had not conducted any independent investigation on the case. Rather, Lofaro, with the assistance of other NYPD officers, had conducted the investigation. Adamczyk admitted that when Lofaro conveyed information to her, she did not ask him to explain how he knew the information to be true.

Prior to the submission of the warrant application, Adamczyk performed a database check for the name "Abraham Hernandez" and the location New York. The database check returned three results -- Machuca Hernandez Abraham, Machuca Abraham, and Machuca-Hernandez Abraham -- all of whom were associated with the apartment unit identified by the NYPD.

With input from Lofaro and Adamczyk, Mortazavi continued drafting the complaint against Hernandez. Mortazavi also drafted the warrant application and warrant affidavit with Adamczyk's assistance, even though it was Adamczyk who would ultimately swear to the truth of the information in the warrant affidavit. Lofaro remained present while Mortazavi drafted the warrant application and warrant affidavit. One of Mortazavi's supervisors reviewed the warrant affidavit before its submission.

1.   The Federal Complaint and Warrant Affidavit

On the morning of November 8, 2018, Adamczyk swore out a complaint (the "November 8 Complaint," Gov.'s Ex. 1) against Hernandez, which Mortazavi also signed. Hernandez's federal presentment was held at 3:10 p.m. Shortly before 3:45 p.m. that day, Adamczyk swore out an application for a warrant to search Hernandez's residence and an affidavit in support of the application (the "Warrant Application" and

"Warrant Affidavit," Gov.'s Ex. 2). The Warrant Affidavit explicitly incorporated the November 8 Complaint by reference. The magistrate judge issued the Warrant at 3:45 p.m. on November 8.

At the suppression hearing before this Court, Adamczyk testified that, at the time she swore out the November 8 Complaint and Warrant Affidavit, she believed the assertions they contained to be true and that she was not aware of information that, in her view, contradicted the assertions in those submissions. She further testified that she had no doubts as to the existence of probable cause supporting the search at that time.

The Warrant Affidavit, however, contained a number of inaccurate statements and omissions. First, it referred to the informant as "Witness-1," omitted to mention that the informant would be paid for providing information, and failed to provide information about the informant's reliability, criminal history, pending charges, or ongoing criminal activity. Lofaro told Mortazavi and Adamczyk that the information came from an informant, but Mortazavi decided to characterize the informant as a witness. When asked to explain that decision, Mortazavi stated that "there was something about . . . the way the information was reported where the [informant] felt more like a

civilian . . . ." Nov. 26 Tr. 91:25. Adamczyk similarly testified that she considered the Confidential Informant to be a "complaining witness" because "[s]he's the one that brought the information forward." Nov. 26 Tr. 15:13-15. Both Adamczyk and Mortazavi testified that they did not intend to hide that "Witness-1" was a confidential informant.

In the course of her duties at the FBI, Adamczyk encountered complaints and affidavits that referred to confidential informants as such, but she had not signed one before. Although she received training on preparing search warrant affidavits at the FBI Academy, she disclaimed any knowledge of the law relating specifically to warrant affidavits that rely on evidence from confidential informants. She did not consult with any of her superiors about any requirements that apply to such warrant affidavits when preparing her affidavit in this case. Mortazavi had previously drafted a complaint based on information from a confidential source and knew that prosecutors typically include information regarding sources' records of reliability.

Adamczyk and Mortazavi were, at the time, aware how heavily the Warrant Affidavit relied on the informant's account. But, according to Adamczyk, they never discussed

gathering additional information about the informant. When she signed the Warrant Affidavit, Adamczyk had not spoken to the informant and had not seen written documentation of what the informant told the NYPD. In fact, Adamczyk admitted that she "didn't know anything at all about the confidential informant" when she signed the Warrant Affidavit. Nov. 26 Tr. 59:24-60:1. She understood at the time that "many confidential informants have a criminal history" but did not recall asking Lofaro about the informant's past. Nov. 26 Tr. 44:34-25. When asked whether she "wanted to know something about who this confidential informant was" before signing the November 8 Complaint and Warrant Affidavit, Adamczyk responded, "No." Nov. 26 Tr. 42:20-23. Mortazavi was likewise unable to recall asking or receiving information about the informant.

Second, the Warrant Affidavit indicated that the informant knew the name and address of the Kik user who sent her child pornography. Specifically, Adamczyk stated that: "Witness-1 reported to law enforcement that ABRAHAM HERNANDEZ lives at [a particular address, including an apartment number]." Warrant Aff. ¶ 11(a). See also id. ¶ 12 ("On or about November 7, 2018, Witness-1 reported to a New York City Police Department ("NYPD") precinct that Witness-1 had received the videos from ABRAHAM HERNANDEZ."). In

fact, although the confidential informant provided the Kik user's building address, she did not provide his apartment number or legal name. As discussed above, Noh's searches yielded Hernandez's name and apartment number, and Adamczyk's database search -- which she conducted before swearing out the Warrant Affidavit -- corroborated the link between Hernandez's name and the apartment. Adamczyk denied that Lofaro told her that the informant did not know the Kik user's apartment number and could not recall if he told her the informant did not know the Kik user's legal name.[13] Lofaro testified that he could not specifically recall telling Mortazavi and Adamczyk that the informant did not recall Hernandez's name. Lofaro testified that he explained to Mortazavi and Adamczyk the searches Noh had conducted to link the Armanixprincex Kik account to Hernandez "[o]nly to the extent that [he] was aware," noting that he was not personally involved in conducting the searches. Nov. 26 Tr. 207:9-14. As noted above, Lofaro was not able to provide the Court with any meaningful detail regarding Noh's searches.

Third, the Warrant Affidavit represented that, "[a]ccording to Witness-1, Witness-1 has known HERNANDEZ

---

[13]   Mortazavi similarly testified that she believed, as of November 8, that the informant had provided Hernandez's name.

for approximately one year, has engaged in sexual acts with HERNANDEZ multiple times, and has seen HERNANDEZ's apartment in the Bronx, New York." Warrant Aff. ¶ 12. Adamczyk testified that, as of November 8, she believed this information to be true based on what Lofaro told her. She claimed she learned on November 27, 2018 that the informant had sex with Hernandez only once and had known him longer than a year.

Fourth, the Warrant Affidavit stated that "based on Witness-1's prior observations of HERNANDEZ's apartment, Witness-1 recognized the background" of three of the videos that depicted pre-pubescent girls engaged in sexual activities "as HERNANDEZ's apartment in the Bronx, New York." Warrant Aff. ¶ 12(b)-(d). Adamczyk testified at the hearing that she still believed that the informant told Lofaro that she recognized the background of the videos as the Kik user's apartment. When executing the Warrant to search Hernandez's apartment, however, Adamczyk concluded that the layout of Hernandez's apartment did not align with the layout of the apartment in the videos. Adamczyk testified that, before signing the Warrant Affidavit, she did not attempt to corroborate the informant's claim by, for example, asking if Lofaro or other NYPD officers who had been inside the apartment saw a room similar to the

room featured in the videos.[14] A non-final draft of the November 8 Complaint, however, referenced "conversations with law enforcement agents who arrested HERNANDEZ" as supporting the belief that child pornography videos were "filmed in HERNANDEZ's apartment." Def.'s Ex. 3506-24. This content was not included in the final November 8 Complaint. Mortazavi could not recall why she deleted this information.

Fifth, Hernandez alleges that that the Warrant Application misleadingly indicated that Internet Protocol ("IP") connection logs linked Hernandez to the Armanixprincex Kik account and omitted that the account had first been registered in June 2018. The Warrant Affidavit incorporated by reference the November 8 Complaint, which stated that IP connection logs associated with the Armanixprincex username "indicat[ed] that . . . ABRAHAM HERNANDEZ, the defendant, accessed and communicated using

---

[14] The Court found Lofaro credible when he testified that he told Adamczyk and Mortazavi that NYPD officers had entered and remained inside the apartment. In contrast, Adamczyk's testimony was inconsistent with regard to whether she was, at the time, aware that NYPD officers had been inside the apartment. Compare Nov. 26 Tr. 38:23-39:2 (Q: "Now, you also -- you also knew at that time that there were already police officers inside Mr. Hernandez's apartment, right?" A: "Yes, I had been informed that there were two uniformed officers in the apartment."), with Nov. 26 Tr. 57:17-19 ("It was my understanding that the uniformed officers were not inside the location but outside the location . . . ."). Additionally, because Adamczyk said that she did not take notes on the investigation prior to signing the Warrant Affidavit, she testified entirely from her recollection. Adamczyk's testimony on this issue thus raises a question as to whether it represented the extent of her knowledge as of November 8, 2018.

the Kik online application from the Bronx, New York" in early November 2018. Nov. 8 Compl. ¶ 6. The IP connection logs did not provide Hernandez's name or any other information unique to him, but referenced the Armanixprincex Kik username and Armani Prince display name. Adamczyk had requested and received the logs before she and Mortazavi signed the November 8 Complaint. A prior draft of the November 8 Complaint stated only that the logs indicated the location where the Armanixprincex Kik user, as opposed to Hernandez, accessed the Kik application. In describing the IP connection logs, the November 8 Complaint and Warrant Affidavit did omit that the logs reflected that the Armanixprincex account had been registered in June 2018. Mortazavi did not view the registration data as casting doubt on the informant's claim that she had known the Kik user for approximately a year, given the possibility that she was communicating with him though other social media avenues.

Finally, the Warrant Affidavit and Complaint omitted other information regarding the NYPD's investigation, including that NYPD officers had entered Hernandez's apartment, seized two phones, saw no signs of a minor living in the apartment, and remained present inside Hernandez's apartment. A prior draft of the November 8

Complaint disclosed that the NYPD officers had entered Hernandez's apartment and arrested Hernandez. See Def.'s Ex. 3506-24, at 4. Mortazavi could not recall why she deleted that information from the final version of the November 8 Complaint. When Adamczyk signed the Warrant Affidavit, she knew that the NYPD had seized two phones from Hernandez and had learned from Lofaro that the NYPD was securing the apartment from within.[15]

At 3:45 p.m. on November 8, the magistrate judge issued the Warrant, authorizing a search of Hernandez's residence and electronic devices.

### 2.   Execution of the Search Warrant

Shortly after the magistrate issued the Warrant, the FBI commenced a search of Hernandez's apartment. When they arrived, the NYPD had been securing the apartment for more than 39 hours.

As noted above, Adamczyk concluded when executing the Warrant that the layout of Hernandez's apartment did not align with the layout of the apartment shown in the videos the informant received through Kik. On the morning of November 9, Mortazavi informed her supervisors that, if Hernandez had produced the child pornography, he did not do so at his house.

---

[15] See supra n.14.

The FBI seized certain electronic devices during the search of Hernandez's residence. Adamczyk was not present when the devices were seized and could not confirm what any on-site review of the data on the devices uncovered. She testified that, as a matter of standard practice, the FBI conducts an "on-site triage" of seized electronic devices, but she did not specify whether such a triage entails a review of any data on the devices. The data on the devices was thoroughly reviewed at a later time, but neither Adamczyk nor Mortazavi knew when that review occurred.

### 3.   Follow-up with the Confidential Informant

On November 20, 2018, the informant received $400 for providing information regarding this case. Seven days later, she met with Adamczyk, Mortazavi, and Jennings. At the November 27, 2018 meeting, the informant confirmed that the NYPD registered her as an informant in September 2018, approximately two months before she provided the tip in this case. She explained that she had eight pending criminal cases that she hoped to resolve in December 2018. The informant's criminal history report from the NYPD indicates that she had been charged with assault and harassment and had been arrested multiple times for prostitution, including as recently as October 2018. At the November 27, 2018 meeting, the informant stated that she

had sex with Hernandez only once, approximately 18 months prior, and that that occasion was the only time she had been to his apartment. The informant confirmed that she did not know Hernandez's legal name until the police provided it to her. She represented that she could not remember the Kik account name of the person who sent her the child pornography videos and had deleted all the Kik messages between herself and that person.

### 4. Subsequent Events

On November 28, 2018, one day after Adamczyk, Mortazavi, and Jennings met with the informant, the Government dismissed the November 8 Complaint against Hernandez on its own motion, without prejudice. Based on evidence obtained pursuant to the Warrant, however, on January 22, 2019 the Government filed a criminal complaint charging Hernandez with possession of child pornography.

## II.   **LEGAL STANDARD**

The party moving for suppression of evidentiary material generally bears the burden of proving, by a preponderance of the evidence, that the evidence was obtained in violation of the movant's constitutional rights. See United States v. Matlock, 415 U.S. 164, 177 n.14 (1974); United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). When officers conduct a search without a

warrant, however, the burden shifts to the Government to prove that the search fell within one of the few established exceptions to the warrant requirement. <u>See Arboleda</u>, 633 F.2d at 989.

### III. <u>DISCUSSION</u>

A.   <u>THE NYPD'S WARRANTLESS ENTRY INTO HERNANDEZ'S HOME</u>

The Government argues that consent and exigent circumstances rendered the NYPD's warrantless entry into Hernandez's residence reasonable and thus consistent with the Fourth Amendment. For the reasons discussed below, the Court concludes that the Government has not demonstrated that Ms. Hernandez voluntarily consented to the police officers' entry but holds that exigent circumstances justified the officers' warrantless entry.

1.   <u>Consent</u>

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV.   The entry of a person's home without a warrant supported by probable cause is per se unreasonable, with only a few specific exceptions. <u>Payton v. New York</u>, 445 U.S. 573, 576 (1980); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). One exception to the warrant requirement is valid third-party consent. <u>Schneckloth</u>, at 245-46. Even without a warrant or probable cause, police "may approach a

home and knock" and request permission to speak or enter "because that is no more than any citizen might do." <u>Florida v. Jardines</u>, 569 U.S. 1, 8 (2013) (quotations and citations omitted).

When "the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary." <u>United States v. Snype</u>, 441 F.3d 119, 131 (2d Cir. 2006). Whether consent was voluntary or, instead, the product of duress or express or implied coercion "is a question of fact to be determined from the totality of all the circumstances." <u>Payton</u>, 445 U.S. at 227. The Fourth Amendment is satisfied when an officer's belief that consent authorized an entry was, under the circumstances, objectively reasonable. <u>United States v. O'Brien</u>, 926 F.3d 57, 76-77 (2d Cir. 2019) (citing <u>Florida v. Jimeno</u>, 500 U.S. 248, 249-251 (1991)).

Consent need not be expressed but may be implied by "an individual's words, acts, or conduct." <u>United States v. Deutsche</u>, 987 F.2d 878, 883 (2d Cir. 1993). For example, the Second Circuit held that officers had a reasonable basis to believe that consent justified entry into an apartment where a man admitted officers into his building and did not object as the officers followed him down the

hall and into his apartment. United States v. Grant, 375 F. App'x 79, 80 (2d Cir. 2010). Officers' belief that a person's actions indicated consent may be objectively reasonable, even if the person did not actually intend to communicate consent. See Seifert v. Rivera, 933 F. Supp. 2d 307, 316. (D. Conn. 2013) (holding that although a woman may have stepped back from her door to restrain a dog from running outside, "it was objectively reasonable for the [d]etectives to believe that [she] had consented to their entry when she stepped backwards from the open door")

At the same time, however, mere submission to a show of authority is not voluntary consent. See Kaupp v. Texas, 538 U.S. 626, 632 (2003) (per curiam). "In seeking consent, the police may not 'convey a message that compliance with their requests is required.'" United States v. Lopez, No. 97 CR 483, 1997 WL 790582, at *5 (S.D.N.Y. 1997) (quoting Florida v. Bostick, 501 U.S. 429, 435 (1991)); see Schneckloth, 412 U.S. at 229 ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions."). Courts often determine that consent was not voluntarily given where officers issued commands, rather than making requests. See, e.g., Kaupp, 538 U.S. at 631 (holding that the defendant's

response of "okay" did not establish consent where officers had "rous[ed] [the defendant] out of bed in the middle of the night with the words 'we need to go talk'"); <u>Johnson v. United States</u>, 333 U.S. 10, 368 (1948) (holding that consent did not authorize a search where officers "demanded" entry by knocking on a door and stating, "'I want to talk to you'"); <u>United States v. Flowers</u>, 336 F.3d 1222, 1226 n.2 (10th Cir. 2003) ("[A] reasonable person confronted by police officers outside his door at night and a command by one of the officers to allow them to enter, would have believed that he had to open the door of his home and submit to the show of authority."); <u>United States v. Connor</u>, 127 F.3d 663, 665-66 (8th Cir. 1997) (holding that a man did not voluntarily consent to officers' entry after officers knocked and announced themselves three times and shouted, "Open up"); <u>United States v. Winsor</u>, 846 F.2d 1569, 1571, 1573 n.3 (9th Cir. 1988) (holding that a man did not voluntarily open a door, indicating consent to a search, where officers had commanded him to do so by stating, "Police. Open the door"); <u>see also</u> <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548-49 (1968) (holding that consent given after an officer represented that he had a warrant was "no more than acquiescence to a claim of lawful authority").

For example, United States v. Roldan, No. 97 CR 567, 1997 WL 767564, at *5 (S.D.N.Y. Dec. 11, 1997), involved an officer who attempted to ask a Spanish-speaking man in Penn Station for consent to a search the man's bag. But the officer, who had only limited Spanish training, actually stated "in the imperative form 'Let's look in the bag.'" Id. The court reasoned that the officer's use of the imperative form was a "verbal assertion of authority" that "created a coercive atmosphere . . . ." Id. at *6. Under the circumstances, the court determined that the officer could not have reasonably interpreted the defendant's response -- setting down his bag and standing with his arms outstretched -- as communicating voluntary consent. Id.

In assessing the circumstances "to determine if in fact consent to search was coerced, account must be taken of . . . the possibly vulnerable subjective state of the person who consents." Schneckloth, 412 U.S. at 229. Whether the person who gave consent knew of her right to refuse consent "is not a requirement to a finding of voluntariness, although it may be a factor in ascertaining whether the consent was coerced." United States v. Garcia, 56 F.3d 418, 422-23 (2d Cir. 1995). Other relevant considerations include "the age, education, intelligence, and English language proficiency of the person giving

consent, the length of any detention, [and] the use of physical punishments or deprivations . . . ." Lopez, 1997 WL 790582, at *6 (citations omitted). See United States v. Wilson, 11 F.3d 346, 352 (2d Cir. 1993) ("[The defendant]'s limited education and knowledge of the English language, coupled with the fact that he was not informed of his right to refuse consent to the search, cause us to doubt whether [he] actually consented to this search . . . .").

In sum, the Constitution does not prohibit police officers from knocking on a door in hopes of obtaining consent to enter. See Kentucky v. King, 563 U.S. 452, 466-67 (2011). And officers "may have a very good reason to announce their presence loudly and to knock at the door with some force." See id. at 468. But where officers assert their authority by making a demand, the situation can become coercive. In assessing whether consent was coerced, the court must take into account the consenting party's vulnerabilities.

Here, Ms. Hernandez heard a loud knock on her door and observed at least four police officers outside, at least some of whom were in uniform[16] and some of whom were armed with guns. She testified that she opened the door only

---

[16] Although Lofaro believed the officers were all in plain clothes, Ms. Hernandez testified that she knew the men outside her door were police in part because some of them were in uniform. The Court credits Ms. Hernandez's testimony on this point.

after an officer "told [her] to open the door." Jan. 6 Tr.
at 27:13-25. Her testimony indicates that the officers
commanded her to open the door, and the Government offered
no evidence to rebut her testimony or otherwise indicate
that Ms. Hernandez knew she could deny the officers entry.
Indeed, Lofaro could not recall what his captain said to
Ms. Hernandez before she opened the door. Once she had
opened the door, an officer asked where Hernandez's room
was, and Ms. Hernandez "showed him." Jan. 6 Tr. at 28:3-6.
This is likely the point at which Ms. Hernandez made the
gesture that Lofaro interpreted as indicating that she
consented to the officers' entry into her apartment.

When the officers made a show of authority by
commanding Ms. Hernandez to open the door, they created a
coercive atmosphere. And, here, the totality of the
circumstances -- the lateness of the hour, the four or more
officers present including some with guns, Ms. Hernandez's
limited education, her lack of knowledge regarding her
right to deny the police access, and the NYPD's failure to
inform her of this right -- indicates that Ms. Hernandez
was vulnerable to the police's show of authority.
Ultimately, the Court is not persuaded that the officers,
after issuing a command to Ms. Hernandez, had an
objectively reasonable basis for interpreting any gesture

Ms. Hernandez made as communicating consent. <u>See</u> <u>Lopez</u>, 1997 WL 790582, at *6 (holding that the Government failed to demonstrate that an occupant voluntarily consented to a search where no government witness refuted the occupant's claim that law enforcement officers made coercive statements).

2.  <u>Exigent Circumstances</u>

Warrantless entries, searches, and seizures do not violate the Fourth Amendment when there is probable cause and the exigencies of the situation make the needs of law enforcement so compelling that the warrantless [conduct] is objectively reasonable . . . ." <u>Kentucky v. King</u>, 563 U.S. 452, 460 (2011); <u>Dalessandro v. County of Nassau</u>, 758 F. App'x 165, 167 (2d Cir. 2019) ("Warrantless entry is justified when there is both probable cause and exigency" (citing <u>Kirk v. Louisiana</u>, 536 U.S. 635, 638 (2002) (per curium))). Exigencies exist, for example, when law enforcement officers "need to provide emergency assistance to an occupant of a home" or "engage in 'hot pursuit' of a fleeing suspect." <u>Missouri v. McNeely</u>, 569 U.S. 141, 149 (2013) (citations omitted). In such circumstances, "a warrantless search is potentially reasonable because there is a compelling need for official action and no time to secure a warrant." <u>Id.</u> (citations omitted).

To determine whether an exigency existed, the Court must ask whether, in light of all the circumstances, "it was objectively reasonable for the law enforcement officers to believe there was an urgent need for th[eir] warrantless conduct." United States v. Delva, 858 F.3d 135, 152 (2d Cir. 2017). "The officer's subjective motivation is irrelevant." Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006). In determining whether an exigency exists, relevant considerations may include:

> (1) The gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

United States v. Lopez, 937 F. 2d 716, 722 (2d Cir. 1991) (internal quotations omitted). Where, as here, the Government asserts that law enforcement was faced with the need to provide immediate aid to an occupant, the Government must establish that it was "objectively reasonable" for officers to believe an occupant needed "emergency assistance" or "protect[ion] from imminent injury." Brigham City, 547 U.S. at 403.[17]

---

[17] When applying the emergency aid exception, lower courts have observed that the exception does not always require probable cause to believe someone has committed a crime. See, e.g., Figueroa v. Mazza, 2017 WL

In the analysis that follows, the Court considers the circumstances confronting the officers at the moment they entered Hernandez's apartment. The Court concludes that the NYPD had an objectively reasonable basis for believing that the exigencies of the situation required their warrantless entry.

a.   Probable Cause

The Court is persuaded that the NYPD had probable cause to believe Hernandez had statutorily raped his sister's friend and produced, possessed, and distributed child pornography depicting his sister and his sister's friend. "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983). To decide whether an informant's information provides probable cause, a court must consider the totality of circumstances, including the informant's veracity, reliability, and basis of knowledge, any

---

1194648, at 8 (E.D.N.Y. Mar. 30, 2017). In an emergency aid case, the "probable cause requirement" is satisfied when the police had "an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger." Id. Answering that question in the affirmative certainly does not require a determination that officers had probable cause to believe a crime was committed when, for example, police are entering to thwart an apparent suicide attempt or to aid occupants of a burning building. In a case such as this one, however, determining whether officers had an objectively reasonable basis for believing persons were in danger in the location they entered depends on a determination that officers had strong reason to believe someone was committing an ongoing crime in that location.

"corroboration of details of [the] informant's tip by independent police work," and any other evidence of reliability. Id. at 238-241. "[I]n determining the overall reliability of a tip," a "deficiency in [the informant's reliability or basis of knowledge] may be compensated for by a strong showing as to the other, or by some other indicia of reliability." Caldarola v. Calabrese, 298 F.3d 156, 162-63 (2d Cir. 2002).

As of November 7, Lofaro had no information about whether the informant had previously provided useful information. But "[i]n assessing the veracity of an informant's statements, it is improper to discount the information provided simply because the informant has no proven record of truthfulness or accuracy." Gagnon, 373 F.3d at 236 (quotations and citations omitted).

Lofaro should have known that the informant may have hoped for monetary compensation or leniency with respect to any criminal conduct or charges, calling into question her reliability. ¨Indeed, the Second Circuit has observed that a criminal informant "is less reliable than an innocent bystander with no apparent motive to falsify." United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004) (quotations and citations omitted). At the same time, however, the informant initiated the communication about

the Kik user's potential criminal activities by bringing
her allegations to the NYPD, and, according to Jennings,
she represented that she did not want to be paid for
providing the information. She then met with Lofaro face-
to-face, "run[ning] the risk that [s]he m[ight] be held
accountable if [her] information [wa]s proven false." Id.
(quotations and citations omitted). Additionally, by
showing Lofaro the Kik conversation -- in which the
informant requested and received videos purportedly
depicting the Kik user engaging in sexual activities with
minors -- the informant subjected herself to potential
criminal prosecution. In United States v. Harris, 403 U.S.
573, 583 (1971), a plurality of the Supreme Court explained
that an informant's admission of a crime lends credibility
to the informant's tip. "That the informant may be paid or
promised a 'break' does not eliminate the residual risk and
opprobrium of having admitted criminal conduct." Id. at
583-84.

The informant's basis of knowledge for claiming that
the Kik user was engaging in sexual activities with his
underage sister and her 13-year-old friend and sending
videos depicting those activities was strong: the Kik
user's own assertions and videos he sent to the informant.
As the informant showed Lofaro the Kik conversation, there

were no doubts as to whether the Kik user had, in fact, made these admissions and sent videos containing child pornography.

In addition, the Kik messages corroborated the informant's claim that she knew the Kik user's address. At one point, the informant wrote that she could "get a ride" if the Kik user wanted her to come over, and the Kik user replied "Yeah come." Gov.'s Ex. 4 at 116. This exchange supported a reasonable inference that the informant knew the Kik user's address. In addition, the screenshot of the ArmaniPrince MeetMe profile, which the Kik user claimed as his own, indicated that the Kik user's current geolocation was Mott Haven, New York -- the neighborhood where the apartment building that the informant identified is located. That the informant knew the Kik user's address, in turn, lent credibility to her claim that she had been to the Kik user's apartment.

The parties dispute whether the Kik conversation and NYPD investigation provided probable cause to believe Hernandez was the Kik user, who indicated that he had sexually abused his sister and his sister's friend at his apartment. As discussed above, the informant could not provide the Kik user's real name. However, the Armanixprincex Kik account featured a profile picture, and

the Kik user claimed the ArmaniPrince MeetMe account, which
also featured a profile picture, as his own. Noh ran
searches using the Kik account's profile picture, username,
and its Armani Prince display name. Through these searches,
Noh determined that someone who used the name Armani_Prince
on another social media platform went by AJ Hernandez. By
running that name through NYPD databases, Noh identified a
driver's license photo of Hernandez, who appeared to be the
person depicted in the MeetMe profile picture.

Hernandez argues that the Kik user's decision to make
its profile picture a photo of Hernandez does not support a
conclusion that the Kik user was, in fact, Hernandez. In
support of this argument, Hernandez cites United States v.
Vayner, 769 F.3d 125 (2d Cir. 2014). There, the Second
Circuit held that a social media profile was insufficiently
authenticated and should not have been admitted at a trial,
even though the account displayed the defendant's name,
photograph, and details about his personal life. But the
Second Circuit recognized in Vayner that evidence may be
authenticated by its distinctive content -- content that is
not generally known or available to others. The account in
Vayner could not be authenticated based on distinctive
content because the details the account contained were
known to persons other than the defendant.

Here, in contrast, the Kik user sent the informant a video of Hernandez masturbating. Counsel did not explicitly ask whether Hernandez's face was visible in this video. However, Mortazavi testified that this video was "of the defendant . . . ." Nov. 26 Tr. 158:16-17. Additionally, Adamczyk represented in the Warrant Affidavit that this video was a "video of HERNANDEZ . . . ." Warrant Aff. ¶ 12. Hernandez does not challenge the accuracy of that assertion. The officers could reasonably conclude that the chance of someone other than Hernandez possessing such a video was extremely low. Accordingly, the officers had reason to believe that the Armanixprincex Kik account likely belonged to Hernandez and, accordingly, that Hernandez had sexually abused his sister and sister's friend. Of course, the officers could not be certain that Hernandez was the Kik user, but probable cause does not require absolute certainty.

b.   Suspect's Presence at the Location to Be Searched

The Court is also persuaded that the officers had a strong reason to believe that Hernandez was at the apartment before they entered. As discussed above, the informant provided a building address, and Noh's searches identified a unit in that building that was associated with the last name "Hernandez." Hernandez argues that the

Government has not provided information indicating that this address information was current. As he correctly points out, the Government has not established when the Kik conversation occurred or when, according to the results of Noh's searches, someone with the surname "Hernandez" was associated with the apartment. See United States v. Carter, No. 2:18 CR 257, 2018 WL 6831124, at *8 (D.S.C. Dec. 28, 2018) (holding that undated screenshots of messages sent the day before the screenshots were taken did not, in conjunction with a confidential informant's statements, provide probable cause for a warrantless search). However, Ms. Hernandez testified that she confirmed to the officers that Abraham Hernandez lived in the apartment before she ever opened the door. At the time the officers entered, they therefore had strong reason to believe Hernandez was present at the apartment.

    c.   Need for Emergency Aid or Protection

Courts have repeatedly held that warrantless searches are reasonable where a minor's safety is threatened. But, consistent with Brigham City, courts have required the Government to demonstrate that "the facts known to the entering agents provided an objectively reasonable basis to conclude that [the minor] was inside [the location searched] and in need of help." United States v. Thomas,

14-CR-00031, 2015 WL 164075, at *4 (D. Conn. Jan. 13, 2015) (quotations and citations omitted), aff'd sub nom. United States v. Walters, 678 F. App'x 44 (2d Cir. 2017). Whether a need for emergency aid exists "does not depend on the officers' subjective intent or the seriousness of any crime they are investigating." Michigan v. Fisher, 558 U.S. 45, 47 (2009).

In Thomas, for example, the court held that exigent circumstances justified officers' warrantless entry of a hotel room where the facts known to the officers at the time provided a reasonable basis to believe that a missing girl was being prostituted out of that hotel room and, at the time of entry, was with a customer. 2015 WL 164075, at *5. See also, e.g., United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994) (holding that exigencies justified a warrantless entry after police observed and spoke to a minor who asserted that she was being locked in an apartment against her will); United States v. Price, No. 17-CR-301, 2017 WL 4838307, at *3 (E.D.N.Y. Oct. 23, 2017) (holding that exigencies justified the warrantless entry of a location that officers observed the defendant entering with a missing female, who officers had probable cause to believe the defendant was trafficking and statutorily raping).

Here, the Court is persuaded that the NYPD had an objectively reasonable basis for believing that a minor in the apartment required the NYPD's protection from imminent harm. The messages indicated that the Kik user's sister lived in his house and that her friend sometimes slept over. The Kik user stated that he began having sex with the 13-year-old in the summer but only engaged in sexual activities with her a couple of times. However, given that the Kik user sent the informant five separate videos and indicated that he could "show her a lot more" if she came to his house, police officers could reasonably have concluded that the Kik user was downplaying the frequency and number of his sexual contacts with the 13-year old. Moreover, the Kik user represented that, at the time he sent the messages, he was contemplating engaging in sexual activities with the 13-year-old again and had a means of contacting her to request that she come to his home. In addition, the officers could reasonably have interpreted the Kik messages as indicating that the Kik user had sexually abused his sister. As the Kik user's messages indicated that his sister lived with him, the officers had an objectively reasonable basis for believing that the Kik user's sister was in the apartment and in continuing danger. The officers could not know with certainty whether

the Kik user's sister or her friend were in imminent danger at the moment of their entry, but they had an objectively reasonable basis for perceiving an immediate threat to the minors' safety. This point is reinforced by the officers' behavior upon entering the Hernandez residence. They evinced belief that the minors were in the apartment by showing Ms. Hernandez photos of the two girls, asking whether she had seen them, and in fact looking for them elsewhere in the building.

d.   Remaining Factors

Here, the offense at issue -- sexually exploiting minors to produce child pornography -- was undoubtedly grave. The circumstances of the entry were relatively peaceful insofar as the officers had announced themselves, did not draw their guns, and entered only after Ms. Hernandez opened the door and gestured in a manner that the officers subjectively interpreted as allowing them to enter the premises.

e.   Totality of the Circumstances

Considering all of the above factors, the Court concludes that the NYPD had an objectively reasonable basis to believe that the exigencies of the situation required their warrantless conduct. Not only did the officers have probable cause to believe that Hernandez committed a grave

50

offense and strong reason to believe he was at the apartment, but they also had an objectively reasonable basis for believing that a minor was in the apartment and in need of their protection from imminent harm. The Court accordingly concludes that the exigencies of the situation justified the NYPD's warrantless entry.

B.   THE POST-ARREST STATEMENT

Hernandez asks the Court to suppress his post-arrest statement. Hernandez argues that the NYPD lacked probable cause to believe he committed a crime at the time of his arrest and that his post-arrest statement was an inadmissible byproduct of the NYPD's unconstitutional entry into his apartment. As discussed above, however, the Court holds that, at the time of the arrest, the NYPD had probable cause to believe Hernandez committed a crime. See supra Section III.A.2.a.

The parties dispute whether the NYPD arrested Hernandez in the hallway outside his apartment or inside the apartment in violation of Payton v. New York, 445 U.S. 573 (1980). In Payton, the Supreme Court held that the Fourth Amendment prohibits police from arresting a suspect in his home without a warrant absent exigent circumstances or consent. But even if the NYPD violated the Fourth Amendment when it entered and searched Hernandez's home,

and even if the NYPD unlawfully arrested Hernandez in his home, the suppression of Hernandez's post-arrest statement does not automatically follow.

"[A] principal purpose of the exclusionary rule" -- which requires the Court to suppress evidence that is the tainted "fruit" of unlawful government conduct -- "is to deter violations of the Fourth Amendment." Segura v. United States, 468 U.S. 796, 828 (1984) (Stevens, J., dissenting). The exclusionary rule, however, does not call for suppression of all evidence that "somehow came to light through a chain of causation that began with an illegal [action]" by law enforcement. New York v. Harris, 495 U.S. 14, 19 (1990) (quotations and citations omitted). Rather, the Supreme Court has restricted its application to areas where it is likely to deter violations of the Fourth Amendment. See id. at 20-21.

In Harris, the Supreme Court held that where, as here, "the police have probable cause to arrest a suspect, the exclusionary rule does not bar the [prosecution]'s use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." 495 U.S. at 21. The Court explained that "[b]ecause the officers had probable cause to arrest [the defendant] for a crime, [he] was not

52

unlawfully in custody when he was removed to the station house, given _Miranda_ warnings, and allowed to talk." _Id._ at 18. Thus, although his statement was a product of his arrest and of being in custody, it was "not the fruit of the fact that the arrest was made in the house rather than someplace else." _Id._ at 20. The Court noted that its conclusion would not change if the police had "illegally entered [the defendant's] home to search for evidence, and later interrogated [him] at the station house." _Id._ at 18. The Court reasoned that suppressing any evidence unlawfully obtained in the home would adequately deter police misconduct and that suppressing a statement subsequently made at a station house would provide minimal additional deterrence value. _Id._ at 20-21.

Applying _Harris_ to the case at hand, the Court concludes that the exclusionary rule does not require suppression of Hernandez's post-arrest statement. Hernandez, like the defendant in _Harris_, made his statement at the police station after police arrested him with probable cause and read him his _Miranda_ rights. Hernandez's statement was therefore "the product of an arrest and being in custody." _Harris_, 495 U.S. at 20. But, as in _Harris_, his statement was "not the product of being in unlawful custody," not the fruit of the location where he was

arrested, and "not an exploitation of [any] illegal entry into [or search of] [his] home." Id. at 18-20.[18]

## C.   THE WARRANTLESS SEARCH OF HERNANDEZ'S KIK ACCOUNT

Hernandez argues that the Government violated the Fourth Amendment when it obtained IP address logs associated with the Armanixprincex Kik account without a warrant supported by probable cause. Hernandez asks the Court to suppress the resulting evidence and disregard it when assessing the validity of the Warrant. For the reasons discussed below, the Court concludes that the Government did not violate the Fourth Amendment when it obtained the IP address logs associated with the Kik user Armanixprincex.

### 1.   Carpenter v. United States

In Carpenter v. United States, 138 S. Ct. 2206 (2018), the Supreme Court held that "an individual maintains a legitimate interest in the record of his physical movements as captured through [cell-site location information ("CSLI")]." 138 S. Ct. at 2217. Accordingly, the Court declared that, the Fourth Amendment requires the Government

---

[18] Although the Government's pre-hearing brief cited Mosby v. Senkowski, 470 F.3d 515, 522 (2d Cir. 2006), which recognizes that the New York State Constitution may require the suppression of evidence that would otherwise be admissible under New York v. Harris, 495 U.S. 14, 19 (1990), the parties have not devoted attention to whether the New York State Constitution requires suppression of Hernandez's post-arrest statement. The Court accordingly declines to resolve that question at this time.

to procure a warrant supported by probable cause before obtaining cell-site information. The CSLI in Carpenter consisted of the location information of the defendant's cellphone at the time of incoming and outgoing calls, which provided an average of 101 data points per day over the course of 129 days. Id. at 2211-12 (emphasis added).

This Court has previously analyzed at length the Carpenter decision and its applicability to IP address information. See United States v. Kidd, 394 F. Supp. 3d 357, 360-69 (S.D.N.Y. 2019). As this Court there explained, in Carpenter "[t]he Supreme Court found that the request for CSLI required it to reconcile two intersecting sets of cases." Id. at 360. "The first set of cases addresses a person's expectation of privacy in his physical location and movements." Id. (quoting Carpenter, at 2215). Under this line of cases, "a person has no reasonable expectation of privacy in his or her movements in a car from place to place." Id. (citing Carpenter, 138 S. Ct. at 2215 (citing United States v. Knotts, 460 U.S. 276 (1983)). But the Supreme Court "circumscribe[d] that holding when faced with more pervasive, augmented, and sophisticated surveillance methods enabled by technology." Id.; see United States v. Jones, 565 U.S. 400, 413, 430 (2012) (holding that the FBI committed an unreasonable search when agents, without a

warrant, installed a GPS tracking device on the defendant's car and tracked the car's "every movement" for 28 days). In Carpenter, the Court interpreted this line of cases as "recogniz[ing] that individuals have a reasonable expectation of privacy in the whole of their physical movements." Carpenter, 138 S. Ct. at 2217 (citations omitted).

"The second set of cases concerns the third-party doctrine," which generally provides that "'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.'" Kidd, 349 F. Supp. 3d at 360-61 (quoting Carpenter, 138 S. Ct. at 2216). Applying the third-party doctrine, the Supreme Court has held, for example, that a defendant had no reasonable expectation of privacy in bank records because he assumed the "risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government." See United States v. Miller, 425 U.S. 435, 433 (1976). In Smith v. Maryland, 442 U.S. 735 (1979), a case this Court previously deemed a potentially "apt comparison for IP address information," the Supreme Court "found that recording the outgoing phone numbers dialed on a landline phone was not a search, because the subscriber 'know[s] . . . that the numbers are used by the telephone company for a

variety of legitimate business purposes, including routing calls.'" Kidd, 349 F. Supp. 3d at 361 (quoting Carpenter, 138 S. Ct. at 2216).

"[T]he Carpenter Court found that CSLI sufficiently implicated the concerns described in the first line of cases regarding" individuals' "'reasonable expectation of privacy in the whole of their movements'" to "justify a narrow exception to the second line regarding the third-party doctrine." Id. at 361 (quoting Carpenter, 138 S. Ct. at 2217). In determining that cellphone users have a reasonable expectation of privacy in CSLI, the Supreme Court focused on the following features of CSLI:

> (1) CSLI is widely retained and easily obtained by the Government; (2) CSLI can be obtained retroactively for discrete intervals over a long period of time; (3) CSLI provides relatively precise location data, and is becoming more and more precise; (4) cellphones constantly generate CSLI without any action on the user's part; and (5) cellphones are ubiquitous in modern life. Taken together, these considerations result in the Government's ability to generate a detailed and comprehensive record of a person's movements.

Id. at 365 (quotations and citations omitted). See Carpenter, 138 S. Ct. at 2217-18. "Ultimately, according to the Carpenter Court, the 'detailed, encyclopedic, and effortlessly compiled"' log created by CSLI 'provides an all-encompassing record of the holder's whereabouts.'" Kidd, 394 F. Supp. 3d at 362 (quoting Carpenter, 138 S. Ct.

at 2217). The Court deemed CSLI "a qualitatively different category" of information than bank records and records of dialed numbers to which the third-party doctrine, accordingly, should not extend. Carpenter, 138 S. Ct. at 2217.

Of note, the Supreme Court "circumscribed Carpenter to preserve its prior third-party doctrine holdings." Kidd, 394 F. Supp. 3d at 362 (quoting Carpenter, 138 S. Ct. at 2220). In particular, the decision "explicitly [did] not 'disturb the application of Smith and Miller' and . . . declined to 'address other business records that might incidentally reveal location information.'" Id. at 362 (quoting Carpenter, 138 S. Ct. at 2220).

2.   IP Address Cases

Before Carpenter, the Second Circuit and other courts held that the Government may collect IP address information without a warrant. See, e.g., United States v. Ulbricht, 858 F.3d 71, 97 (2d Cir. 2017); see also Kidd, 394 F. Supp. 3d at 362 & n.3. "These cases typically relied on the third-party doctrine and analogized IP address information to information historically considered voluntarily disclosed to third parties, such as 'envelope markings' or telephone numbers 'captured by a pen register.'" Kidd, 394 F. Supp. 3d at 362 (quoting Ulbricht, 858 F.3d at 97).

With regard to application of the third-party doctrine to the collection of IP address information, "not much has changed since Carpenter." Id. at 362. Numerous courts have held that Carpenter's reasoning does not require the Government to obtain a warrant to collect IP address information. See, e.g., United States v. Morel, 922 F.3d 1 (1st Cir. 2019) (holding that the defendant did not have a legitimate interest of privacy in IP address data that the Government gathered from Imgur, an image hosting website); United States v. Contreras, 905 F.3d 853, 857 (5th Cir. 2018) (holding that the third-party doctrine permitted the government to obtain records from an internet service provider identifying the address associated with a particular IP address); see also Kidd, 394 F. Supp. 3d at 364 (compiling district court decisions).

In United States v. Hood, 920 F.3d 87 (1st Cir. 2019), the First Circuit held that, even after Carpenter, the third-party doctrine permits the Government to collect Kik IP address data without a warrant. In doing so, the First Circuit noted that, in contrast to the CSLI in Carpenter, the Kik IP address information: (1) covered only a four-day span; (2) was not tracked passively each time the phone received or sent a call, text message, email, or update but was generated through the user's "affirmative decision to

access a website or application"; and (3) did not itself reveal a location but only an IP address, thus requiring the government to conduct further investigation to link the IP address to a location. Id. at 92. The district court in United States v. Jenkins, No. 1:18 CR 181, 2019 WL 1568154, at *4 (N.D. Ga. Apr. 11, 2019), also held that the Government did not violate the Fourth Amendment by collecting Kik IP address logs without a warrant. The court reasoned that the defendant did not show that the Kik IP address logs "track[] a person's movement with 'near GPS-level precision'" such that it "enabled the government to obtain 'near perfect surveillance'" like the CSLI in Carpenter." Id. (quoting Carpenter, 138 S. Ct. at 2218-19).

### 3.   Application

As Hernandez is asking the Court to "suppress evidence seized during a warrantless search," he "bears the burden of showing that he had a reasonable expectation of privacy" in the IP address information that the Government obtained from Kik. United States v. Sparks, 287 F. App'x 918, 920 (2008). If he "makes such a showing, then the burden shifts to the [G]overnment to show that the search fell within one of the exceptions to the warrant requirement." Id. (citations omitted).

In <u>Kidd</u>, this Court declined to "adopt a categorical approach holding that users have no reasonable expectation of privacy in . . . IP address information." 394 F. Supp. 3d at 362. Instead, the Court explained that assessing whether to "[e]xtend <u>Carpenter</u> to new areas requires a precise understanding of the technology at issue, as demonstrated by the [detailed] discussion of [the] technology [at issue] in <u>Carpenter</u> itself." <u>Id.</u> at 368.

Like the CSLI in <u>Carpenter</u>, the Kik IP address information is easily obtainable by the Government, can be obtained retroactively, and can be generated from a cell phone, which "faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." <u>Carpenter</u>, 138 S. Ct. at 2218; <u>Cf. Contreras</u>, 905 F.3d at 857 (holding that the subpoenaed "records revealed only that the IP address was associated" with a residence and thus "had no bearing on any person's day-to-day movement"). Although the record is not well developed on this point, IP address information, when generated, may convey a user's location with "similar degrees of specificity and required investigatory follow-up as CSLI does." <u>Kidd</u>, 394 F. Supp. 3d at 365-66.

Even if Kik IP address logs may reveal location information generated by a cell phone, Hernandez has not provided any evidence indicating that his cellphone "passively generates IP address information for [Kik] to collect in a way similar to CSLI," or that his cellphone consistently conveys "geographically accurate information that follows a [person's] day-to-day movements" in a manner similar to CSLI. Kidd, 394 F. Supp. 3d at 366-67. See Hood, 920 F.3d at 92 ("An internet user generates the IP address data [in Kik IP address logs] only by making the affirmative decision to access a website or application . . . [whereas] every time a cell phone receives a call, text message, or email, the cell phone pings CSLI to the nearest cell site tower without the cell phone user lifting a finger."). The records in Carpenter provided, on average, 101 data points per day over 127 days. By contrast the records here provided an average of less than 10 data points per day over 28 days. That the records here provided significantly fewer data points each day strongly suggests that the Kik IP address logs do not "give the Government near perfect surveillance" in a manner similar to CSLI, GPS-trackers, or ankle monitors. Carpenter, 138 S. Ct. at 2210.

Taking all the above considerations into account, Hernandez has not demonstrated that the Kik IP address collection logs provide the Government with the type of "detailed and comprehensive record of a person's movements" that led the Court to create an exception to the third-party doctrine for CSLI in Carpenter. 138 S. Ct. at 2217; see Kidd, 394 F. Supp. 3d at 366-67. Moreover, Hernandez "has not demonstrated that the IP address information collected from [Kik] is analogous to the all-encompassing collection of CSLI described in Carpenter." Kidd, 394 F. Supp. 3d at 367. For example, he "has not addressed the legal impact of his choice to use [Kik], or . . . argued that the ubiquity of [Kik] approaches that of cellphones, such that it warrants broadening the limited exception for the third-party doctrine created by Carpenter." Id.

Accordingly, the Court finds that Hernandez has not met his burden of showing that he has a reasonable expectation of privacy in the IP address information collected by Kik and obtained by the Government. On that basis, his motion to suppress the Kik account IP address logs must be denied.

D.   EVIDENCE OBTAINED PURSUANT TO THE WARRANT

Hernandez argues that the Court must suppress all evidence that the federal government obtained during its

63

search of the Hernandez residence on November 8, 2018 --
including a laptop and other electronic devices -- for
three reasons. First, Hernandez asserts that the evidence
obtained pursuant to the Warrant is the fruit of the NYPD's
Fourth Amendment violations because, after entering the
apartment without a warrant, the NYPD unlawfully remained
in in the apartment for the 39 hours until federal agents
executed the Warrant. Second, Hernandez claims that federal
agents procured the Warrant by providing an affidavit that
contained deliberately or recklessly false or misleading
material statements in violation of Franks v. Delaware, 438
U.S. 154 (1978). Third, Hernandez argues that the Warrant
was overbroad.

In addition, Hernandez asks the Court to suppress
evidence seized during the execution of the Warrant but not
searched until after the probable cause supporting the
Warrant had lapsed.

In the sections that follow, the Court analyzes
Hernandez's arguments. The Court concludes that, although
the NYPD unlawfully impounded Hernandez's apartment, the
evidence agents obtained pursuant to the Warrant is
nonetheless admissible under the independent source
doctrine. The Court also holds that the Warrant Affidavit
did not violate Franks and was not overbroad. Finally, the

Court holds that it need not suppress evidence seized but not immediately searched because the information officers learned after November 8, 2018 was not material to the probable cause supporting the Warrant.

    1.   <u>Fruit of Fourth Amendment Violations</u>

Hernandez argues that the NYPD violated the Fourth Amendment not only by unlawfully entering his apartment but also by securing it for approximately 39 hours until federal agents executed the Warrant. He argues that these Fourth Amendment violations require the suppression of evidence obtained pursuant to the Warrant. The Government responds that the evidence is not the fruit of any unlawful NYPD action because the Warrant was secured based on information unconnected with any unlawful NYPD action and thus provided an independent source for the evidence. The Government also maintains that the NYPD officers acted lawfully when they secured the apartment because they did so in response to concerns that evidence could be destroyed.

    a.   <u>Securing the Apartment</u>

Warrantless searches and seizures inside a home are presumptively unreasonable. <u>Payton</u>, 445 U.S. at 586. However, in <u>Segura v. United States</u>, 468 U.S. 796 (1984), and <u>Illinois v. McArthur</u>, 531 U.S. 326 (2001), the Supreme

65

Court held that officers may, under certain conditions, secure a residence pending issuance of a warrant in the interest in preserving evidence.

  i.   Segura and McArthur

In Segura, officers entered a home illegally, arrested all occupants, and remained inside the home for 19 hours until agents executed a search warrant. 468 U.S. at 800-01. With regard to whether the officers acted lawfully when securing the premises, the Court issued a highly fact-specific holding:

> [W]here officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

Id. at 798.[19] Most notably, the holding is limited to situations in which all occupants of the premises are arrested; it "has no bearing upon those instances in which the impoundment also involved some interference with the freedom of movement of those authorized to be at the

---

[19] Chief Justice Burger authored the Opinion of the Court, and only Justice O'Connor joined the portion of the Chief Justice's opinion that explained the rationale for this holding. The three other justices who joined the Chief Justice and Justice O'Connor in holding that the officers lawfully secured the premises wrote no concurring opinion to explain their position. Thus, Segura provides limited guidance regarding the constitutionality of actions taken by law enforcement to secure a home pending execution of a search warrant in other factual settings.

premises." 3 W. LaFave, Search & Seizure § 6.5(c) (5th ed. 2012 & 2019 update).

In McArthur, the Court considered whether officers, with probable cause to believe that a man had marijuana in his home, violated the Fourth Amendment by preventing the man from entering his home unaccompanied by an officer for approximately two hours while they obtained a search warrant. See 531 U.S. at 328. The Court held that the seizure was lawful. The Court explained that, to determine whether such a warrantless seizure violated the Fourth Amendment, courts should "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." Id. at 331. In determining the reasonableness of the warrantless seizure in McArthur, the Court examined four considerations: (1) whether police had probable cause to believe the home contained evidence of a crime; (2) whether police had "good reason to fear that, unless restrained, [an occupant] would destroy [the evidence] before they could return with a warrant"; (3) whether police "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether "police imposed the restraint for a limited period of time." Id. at 331-33 (citations omitted).

The Court deemed the seizure in McArthur reasonable after finding each of these conditions satisfied. A closer examination of the Court's discussion of the second, third, and fourth considerations is instructive. As to the second consideration, because the circumstances provided the police with "good reason to fear" destruction of evidence, the Court characterized the case as one presenting "exigent circumstances." Id. at 331. The Second Circuit has observed that the holding of McArthur is a logical extension of the rule that the potential destruction of evidence constitutes an exigency that justifies a warrantless search: "[a]s the need to prevent the imminent destruction of evidence has long been recognized as a sufficient justification for a warrantless search, . . . it follows that the need to prevent the destruction of evidence provides sufficient justification for the less intrusive act of securing the premises until a search warrant is obtained." Lawson v. Hilderbrand, 642 F. App'x 34, 35-36 (2d Cir. 2016).

When assessing the third consideration in McArthur, the Supreme Court reasoned that preventing the man from entering the trailer unaccompanied was "less restrictive" than the alternative options of searching his home, arresting him, or preventing him from entering his home entirely. 531 U.S. at 332, 335. Because the police had

probable cause to arrest the man in McArthur, the case does not speak to the reasonableness of restraints on persons for whom the police lack probable cause to arrest.

And, as for the fourth consideration, the Court concluded that the two-hour restraint was appropriately limited in time because it was imposed for "no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." Id. at 332. The reasoning of McArthur is consistent with the view of the Chief Justice and Justice O'Connor in Segura that "a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration . . . ." 468 U.S. at 812 (Opinion of Burger, C.J., joined by O'Connor, J.). The Chief Justice and Justice O'Connor deemed the 19-hour seizure in Segura reasonable given the time generally required to procure a warrant in the area at that time and that more than half of the delay occurred between 10 p.m. and 10 a.m., "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests." Id. at 812-13.

ii.  Application

The Court now applies the McArthur considerations to assess the reasonableness of the NYPD's 39-hour seizure of Hernandez's home pending issuance of a search warrant.

69

Here, the NYPD had probable cause to believe the apartment contained evidence of a crime. As discussed above, the police had probable cause to believe Hernandez lived in the apartment and that he had produced, possessed, and distributed child pornography. Moreover, the content of the Kik messages supported a reasonable inference that Hernandez willfully accessed and distributed, and was specifically interested in, images of child pornography and likely to retain such images "in the privacy of [his] home." See United States v. Raymonda, 780 F.3d 105, 114-115 (2d Cir. 2015) (explaining that courts have inferred that a suspect is a "collector of child pornography, likely to hoard illicit images" where "circumstances suggest[] that [the suspect] accessed those images willfully and deliberately, actively seeking them out to satisfy a preexisting predilection").

Moreover, the Kik messages indicated Hernandez possessed images of victims he personally abused, supporting an inference that the images were "irreplaceable to him" such that he "would retain them . . . for a very long time." United States v. Carroll, 750 F.3d 700, 705 (7th Cir. 2014). Additionally, the messages supported a reasonable inference that the abuse and production of child pornography had been occurring for some time and would

continue to occur. In light of these considerations, although the Kik messages were undated, officers nonetheless had good reason to believe Hernandez's home contained evidence of a crime. See Carroll, 750 F.3d at 704-05 (collecting decisions from other circuits demonstrating that "years can pass between information about child pornography offenses and applications for search warrants without rendering the information stale"); United States v. Irving, 452 F.3d 110, 116, 125 (2d Cir. 2006) (rejecting staleness argument where warrant issued based on letters the defendant wrote more than two years prior regarding his sexual exploitation of children, images of child erotica found in the defendant's luggage five years earlier, a witness statement regarding sexual abuse that occurred five years prior, and five-year-old identifications of the defendant); United States v. Singh, 390 F.3d 168, 181-82 (2d Cir. 2004) (holding that information regarding fraudulent activities that occurred 20 months ago provided probable cause to search a residence where the information indicated the fraud was "of a continuous and protracted nature").

The police officers here did not, however, have good reason to believe that Ms. Hernandez might destroy or remove evidence. In determining whether officers had an

objectively reasonable basis for believing that destruction of evidence was likely, courts consider: whether an occupant's behavior indicated that destruction of evidence was imminent, see, e.g., United States v. Andino, 768 F.3d 94, 99 (2d Cir. 2014) (holding that officers reasonably believed destruction of evidence was likely when a woman, upon learning of an investigation, slammed her door shut, began opening and closing drawers, and turned on a faucet); whether the evidence was readily destructible, see, e.g., Scott v. City of Mount Vernon, No. 14 Civ. 4441, 2017 WL 1194490, at *12 (S.D.N.Y. Mar. 30, 2017) ("[T]he destruction of evidence exception applies most naturally to those circumstances where narcotics or some other easily destructible piece of evidence is at issue, in contrast to the firearms that officers perhaps hoped they would find here."); and whether any occupant had a motive to destroy evidence, see, e.g., Seifert, 933 F. Supp. 2d at 319-20 (determining that officers reasonably believed family members would destroy evidence where family was on notice of police's robbery investigation and circumstances indicated family may have been complicit).

The evidence the police officers sought in this case included digital evidence of child pornography, which, as various courts have recognized, is readily destructible.

See United States v. Dzionara-Norsen, 19 CR 6131G, 2020 WL
1897179, at *10 (W.D.N.Y. Apr. 17, 2020) (collecting
cases). But the record does not suggest that Ms.
Hernandez's actions or demeanor indicated she would destroy
evidence. As Ms. Hernandez testified, the officers did not
tell her why they arrested her son. It is therefore unclear
how she would have known what, if anything, in the
apartment would be used as evidence against her son. Nor
does the record suggest that officers reasonably believed
that Ms. Hernandez was potentially complicit in the
suspected offenses. Cf. Seifert, 933 F. Supp. 2d at 319-20.

The Government's claim of exigency therefore rests on
the assumption that, after learning of an arrest, those
with a familial relationship to a suspect are likely to
destroy evidence.[20] The Government's reasoning would
authorize warrantless searches and seizures whenever a
suspect's friends or family know of his arrest and have
access to evidence. As the Fifth Circuit has acknowledged,
because "[t]here is almost always a partisan who might

---

[20] United States v. Schaper, 903 F.3d 891, 893 (2d Cir. 1990), cited by
the Government, does not endorse this logic. There, the Second Circuit
held that officers had an objectively reasonable basis for believing
that a suspect's wife would destroy narcotics-related evidence where --
after the suspect learned of the investigation but prior to his arrest
-- agents observed his wife exiting and entering the house and found
the suspect, along with his wife's father, removing evidence from the
home. Id. at 893. Thus, in Schaper, facts indicated that the suspect
had already enlisted his family members to assist him in destroying
evidence prior to his arrest.

destroy or conceal evidence," adopting the Government's view would "result in the evaporation . . . of Fourth Amendment rights" at the moment of arrest. United States v. Davis, 423 F.2d 974, 979 (5th Cir. 1970), cert. denied, 564 U.S. 836 (1970) (mem.). The Court cannot accept the Government's expansive view of situations presenting an exigent risk of evidence destruction as it relates to third parties as to whom there is no evidence of complicity in the underlying offense.

With regard to the third McArthur factor, the Court cannot conclude that officers "made reasonable efforts to reconcile" the need to preserve evidence "with the demands of personal privacy" because the Court has determined that officers lacked a reasonable basis for believing that evidence might be lost. 531 U.S. at 332. The Court nonetheless observes that, as in McArthur, the police did not prevent Ms. Hernandez from entering her apartment entirely. Id. Instead, they allowed her to move freely about the apartment's common spaces but accompanied her when she needed to go into her bedroom. Critically, however, the record does not indicate that the officers gave Ms. Hernandez the option of staying somewhere else such that police might have "avoid[ed] significant

intrusion into the home itself." Id. at 331 (citing Payton, 445 U.S. at 585).[21]

As for the fourth McArthur factor, the Government has not met its burden of demonstrating that the seizure was reasonable in duration. Neither the Supreme Court nor the Second Circuit has identified a bright line rule for when a warrantless seizure of a residence, effected while occupants are present, becomes unreasonably long. Instead, McArthur instructs courts to consider whether the "time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." 531 U.S. at 332.

As discussed above, 19 hours passed between the NYPD's midnight entry of Hernandez's home and Lofaro's first call with Mortazavi and Adamczyk at around 7:00 p.m. on November 7. More than 20 hours passed between that call and the magistrate's authorization of the Warrant. Although Mortazavi, Lofaro, and Adamczyk represented that they acted quickly and with a sense of urgency, the Government has not explained why it was "reasonably *necessary*" for 39 hours to

---

[21] McArthur is distinguishable because officers believed the defendant possessed drugs. See 531 U.S. at 329. The Government does not contend that the NYPD suspected Ms. Hernandez of any criminal offense. Thus, whereas the seizure of the defendant's person in McArthur was supported by probable cause, any seizure of Ms. Hernandez would have lacked such support. See United States v. Watson, 703 F.3d 684, 691-92 (4th Cir. 2013) (distinguishing McArthur). The officers could not lawfully have required Ms. Hernandez to remain with them at the apartment.

elapse before issuance of a search warrant. Id. (emphasis added). None of the Government's witnesses, for example, explained that they thought probable cause was lacking and required time to gather additional information.[22] Nor is there any indication that any significant portion of the delay is attributable to the magistrate.

The Government has not identified any case in which a court deemed reasonable a comparably lengthy home impoundment.

Indeed, the Court's own research has not identified any case holding that the Fourth Amendment allows officers to remain inside a home for a remotely comparable period of time pending issuance of a warrant. See, e.g., United States v. Shrum, 908 F.3d 1219, 1232 (10th Cir. 2018) (deeming 18-hour seizure of home pending issuance of a warrant unreasonable and noting that the duration, coupled with the fact that officers had probable cause within 4 hours, indicated officers had not appropriately balanced law-enforcement needs with Fourth Amendment interests); United States v. Pérez-Díaz, 848 F.3d 33 (1st Cir. 2017)

---

[22] Commentators have observed that, in a jurisdiction with a telephonic warrant procedure, "failure to [seek a telephonic warrant] without good reason might well result in a determination that delay [even] in the two-hour range was unreasonable" under McArthur. 3 W. LaFave, Search & Seizure § 6.5(c) (5th ed. 2012 & 2019 update). As defense counsel pointed out, the NYPD Patrol Guide provides a procedure for obtaining a warrant by phone, but the Government offered no explanation for why officers did not pursue that option in this case.

(deeming 3-hour seizure of home pending issuance of a warrant reasonable); United States v. Blauvelt, 638 F.3d 281, 290 (4th Cir. 2011)(same); United States v. Song Ja Cha, 597 F.3d 995, 1000 (9th Cir. 2010)(holding that a 26.5-hour seizure of a home pending issuance of a warrant was "unconstitutionally long"); Buie v. City of New York, No. 12 Civ. 4390, 2015 WL 6620230, at *6-7 (E.D.N.Y. Oct. 30, 2015) (holding that the seizure of drug suspect's mother's home from 7:30 p.m. or 8 p.m. until "later that night" was reasonable); Seifert, 933 F. Supp. 2d at 327 (deeming 4-hour seizure of home pending issuance of a warrant reasonable); Briddell v. Chester, 206 F. Supp. 2d 733, 736-38 (D. Md. 2002) (deeming reasonable the 5-hour seizure of a drug suspect's mother's home while officers sought a warrant); see also e.g., United States v. Watson, 703 F.3d 684, 693 (4th Cir. 2013) (holding 3-hour detention of an individual in a public building pending issuance of search warrant unreasonable where police provided no explanation for delay in obtaining search warrant).

The seizure at issue in this case is approximately 12.5 hours longer than the 26.5-hour seizure that the Ninth Circuit deemed "unconstitutionally long" in Song Ja Cha. See 597 F.3d at 1000. As the Ninth Circuit explained, "even if the police officers acted diligently during the seizure

interviewing witnesses multiple times and drafting a meticulous warrant application, they took a much longer time than was reasonably necessary to obtain the warrant." Id. at 1001. As the Government has offered no explanation for why obtaining a warrant to search Hernandez's home reasonably required 39 hours in this case, the Court cannot conclude that the police imposed the restraint for a reasonably limited period of time.[23]

Because the Government has not shown that officers had strong reason to believe evidence would be destroyed or that the passage of 39 hours was reasonably necessary to obtain a warrant, the Court concludes that the Government has not carried its burden of demonstrating that the warrantless seizure of Hernandez's home was reasonable.[24]

b. Independent Source

The Government argues that even if NYPD officers violated the Fourth Amendment when they entered and secured the apartment, the evidence seized pursuant to the Warrant should not be suppressed. The Government contends that that

---

[23] Cases deeming reasonable longer seizures of packages, computers, or other objects are not in tension with the Court's holding. "That a package [or other object] may be seized for a longer period of time than a residence is logical given the heightened constitutional protection 'preserving the privacy and sanctity of the home.'" Song Ja Cha, 597 F.3d at 1000 (quoting Payton, 445 U.S. at 588).

[24] Even if the officers had reason to believe evidence would be destroyed such that the seizure was "reasonable at its inception," it nonetheless would have "bec[o]me unreasonable as a result of its duration . . . ." Segura, 468 U.S. at 812 (Opinion of Burger, C.J., joined by O'Connor, J.).

evidence is admissible according to the independent source doctrine, as applied in Segura.

 i. The Doctrine

According to the independent source doctrine, the prosecution may introduce evidence seized from a search pursuant to a warrant as long as it is obtained from a source that is unconnected to any illegality. See Segura, 468 U.S. at 798. The independent source doctrine is grounded in a policy determination that:

> [while] the prosecution is not to be put in a better position than it would have been in if no illegality had transpired[,] . . . the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred. When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.

Nix v. Williams, 467 U.S. 431, 443 (1984).

The Supreme Court applied the independent source doctrine in Segura, where, as discussed above, officers unlawfully entered an apartment before securing it pending issuance of a search warrant. See 468 U.S. at 798. After concluding that the officers secured the apartment in a lawful manner, the Supreme Court considered whether, due to the prior unlawful entry, the evidence discovered during

execution of a delayed search warrant should be suppressed. Id. at 799. The Court declined to suppress the evidence obtained pursuant to the search warrant. That evidence, the Court reasoned, was not "'fruit' of the illegal entry because the warrant, and the information on which it was based, were unrelated to the entry and therefore constituted an independent source for the evidence . . . ." Id. (citations omitted).

The Segura Court indicated that its conclusion would have been the same even if the officers had secured the home in a manner that violated the Fourth Amendment. The Court invoked the rule that "evidence will not be excluded . . . unless the illegality is at least the 'but for' cause of the discovery of the evidence" and reasoned that the securing of the premises was not a "but for" cause of the discovery of the evidence. Id. at 815.[25]

In Murray v. United States, 487 U.S. 533, 537 (1988), the Supreme Court confirmed that the independent source doctrine permits introduction of "evidence obtained for the first time during an independent lawful search" as well as

---

[25] The majority in Segura reasoned that officers could have prevented the destruction of evidence if they had lawfully remained outside the home until a warrant arrived. See 468 U.S. at 816. Moreover, in the majority's view, requiring suppression because officers' unlawful actions prevented the defendant from removing or destroying evidence would "protect criminal activity" and "def[y] logic and common sense." Id.

to evidence that was first obtained "during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." The Court held that, where officers first saw marijuana bales during an illegal search and subsequently returned, with a warrant, and seized them, the drugs were admissible as long as (1) information gathered from the initial illegal search did not influence the "the agents' decision to seek the warrant," and (2) information from the initial illegal search was not "presented to the Magistrate" such that it influenced "his decision to issue the warrant." Id. at 542.

By requiring the Government to show that the decision to seek the warrant was not influenced by a prior unlawful search, Murray bars application of the independent source doctrine in cases where officers conducted a "confirmatory search" -- that is, where officers unlawfully searched a residence "to get assurance that evidence is present before taking the time and effort to obtain a warrant." United States v. Nayyar, 221 F. Supp. 3d 454, 467 (S.D.N.Y. 2016) (quotations and citations omitted), aff'd sub nom. United States v. Mulholland, 702 F. App'x 7 (2d Cir. 2017); see Murray, 487 U.S. at 540 n.2 ("[T]here is nothing to suggest

that [officers] went in merely to see if there was anything worth getting a warrant for.").

The Court in Murray described as "onerous" the "burden of convincing a trial court that no information gained from the illegal entry affected . . . the law enforcement officers' decision to seek a warrant." Id. at 540. The Court remanded the case to the district court to determine whether the warrant provided an independent source, indicating that, to determine whether the decision to obtain a warrant was influenced by a prior illegality, lower courts must conduct a factual inquiry into what motivated the officers to conduct the prior illegal action. Id. at 543.[26] The Court cautioned district courts "not to give dispositive effect to police officers' assurances" that an illegal entry had no effect on their decision to obtain a warrant, explaining that "[w]here the facts render [officers'] assurances implausible, the independent source doctrine will not apply." Id. at 540 n.2.

When assessing whether the Government has satisfied Murray's first requirement, courts consider context to assess the officers' motivations. See United States v.

_____

[26] The Court reasoned that the district court's finding that the officers initially entered, in part, to prevent evidence destruction "could perhaps" support an inference "that the agents who made the entry already planned" to obtain a warrant, but that such an "inference is not . . . clear enough to justify . . . a determination of independent source." Murray, 487 U.S. at 543.

Nayyar, 221 F. Supp. 3d at 467. In particular, courts consider whether officers possessed information indicating that a search warrant would uncover evidence of a crime before they acted unlawfully. Compare, e.g., United States v. Siciliano, 578 F.3d 61 (1st Cir. 2009) (concluding prosecution did not show that agents would have sought a warrant but for their unlawful conduct where testimony indicated police wanted more evidence before seeking a warrant and nothing but an unlawful protective sweep revealed that evidence), with United States v. Sable, 633 F.3d 219, 245 (3d Cir. 2011) (reasoning that officers would have sought a warrant had they not unlawfully opened and reviewed files containing child pornography because it would be "inconceivable" that an officer would not seek a warrant after lawfully viewing "lurid file names indicative of child pornography").

Courts also consider whether officers acted unlawfully because they mistakenly assumed that exigency or consent justified their warrantless actions. See United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993) (holding that independent source doctrine applied where officers had "good reason" to believe tapes contained relevant information prior to unlawfully reviewing them and unlawfully reviewed them based only on a mistaken belief

that they could do so); see also Murray, 487 U.S. at 540 n.2 (contrasting unlawful actions motivated by a mistaken belief as to exigency with unlawful actions motivated by a "'search first, warrant later' mentality").

Hernandez argues that satisfaction of the two Murray requirements is not enough. He asserts that the Government must also show that the evidence would inevitably have been in the apartment when federal agents executed the Warrant if the NYPD had not unlawfully entered and remained there prior to execution of the Warrant. He asks the Court to assess whether the Government has met its burden of proof by relying on Second Circuit decisions regarding the inevitable discovery exception to the exclusionary rule.

The independent source and inevitable discovery rules are derived from similar principles but traditionally apply in different factual settings. The independent source doctrine applies when evidence that is received through an illegal source is also found through a source separate from any illegality. See Murray, 487 U.S. at 539. In contrast, the inevitable discovery doctrine applies if evidence obtained through an illegal source is not also found through a separate source. See id. The focus of the inevitable discovery analysis is on whether police would,

hypothetically, have found unlawfully obtained evidence through a lawful means. See id.

Hernandez's argument, at a more general level, is that the independent source doctrine cannot be applied to admit evidence that was unlawfully seized and never returned to private control before a subsequent lawful seizure. The First Circuit took this position in United States v. Silvestri, 787 F.2d 736, 739 (1st Cir. 1986), cert. denied, 487 U.S. 1223 (1988). There, the First Circuit explained that when unlawfully seized items remain in police control prior to issuance of a warrant, they are not in a position to be legally seized, and, thus, the warrant does not constitute an independent source. To assess whether an unlawfully seized item not returned to private control before issuance of a warrant could be admitted, the First Circuit took precisely the approach that Hernandez advocates here: requiring the Government to demonstrate that "the evidence *inevitably* would have been seized by an independent legal means." Id. (emphasis in original).

The Supreme Court recognized in Murray that it "may well be difficult to establish [the independence of a second seizure] where the seized goods [have been] kept in the police's possession" since an earlier, unlawful seizure. 487 U.S. at 542. But the Supreme Court explicitly

85

recognized and rejected the First Circuit's position that "objects 'once seized cannot be cleanly reseized without returning the objects to private control.'" <u>Id.</u> at 541 (quoting <u>Silvestri</u>, 787 F.2d at 739). The Court explained:

> [R]eseizure of tangible evidence already seized is no more impossible than rediscovery of intangible evidence already discovered. The independent source doctrine . . . rest[s] . . . upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply.

<u>Id.</u> at 542. Based on this discussion in <u>Murray</u>, courts have held that, when <u>Murray</u>'s two requirements are satisfied, the independent source doctrine permits introduction of evidence that law enforcement officers unlawfully seized and held pending the issuance of a search warrant.[27]

---

[27] For example, in <u>United States v. Grosenheider</u>, 200 F.3d 321, 324 (5th Cir. 2000), employees at a computer repair shop notified police that a customer dropped off a computer that contained child pornography. A police officer viewed the images, brought the computer back to his office for safeguarding, and notified a federal agent. The federal agent obtained a search warrant, relying exclusively on information obtained before the police reviewed the computer's files and seized it. The federal agent then picked up the computer from the police, carried it back to the computer repair shop, and notified the shop's employees that he was seizing the computer pursuant to a warrant. The Fifth Circuit rejected the defendant's contention that the federal agent's re-seizure of the computer was not independent from the prior, allegedly unlawful search and seizure. The court reasoned that <u>Murray</u>'s two requirements were satisfied and that, under <u>Segura</u>, arguments about the potential destruction or removal of evidence cannot be used to evade application of the independent source doctrine. <u>See id.</u> at 329-30; <u>see also</u> <u>United States v. Budd</u>, 549 F.3d 1140, 1147-48 & n.4 (7th Cir. 2008) (applying <u>Murray</u> and holding that, where law enforcement unlawfully held a computer in their custody for a month before

Consistent with the Supreme Court's discussion of cases involving reseizures in Murray, the Court will apply Murray's two requirements to determine whether the independent source doctrine would permit introduction of evidence the police officers here obtained pursuant to the Warrant.

## ii. Application

The Court is persuaded that the first requirement of Murray -- that law enforcement's allegedly unlawful entry and unlawful impoundment of the apartment did not influence law enforcement officers' decision to obtain a warrant -- is satisfied. The content of the Kik messages, which the officers possessed and had reviewed before they entered and impounded Hernandez's apartment, provided strong reason for them to believe that evidence of child pornography and sexual abuse would be found in the Kik user's apartment. That officers seized phones from the apartment arguably indicates that they did not actually anticipate obtaining a warrant. But the Court is persuaded that, as discussed above in Section III.A.2, the officers entered Hernandez's

---

obtaining a warrant to search it, prosecutors could nonetheless introduce evidence obtained pursuant to the warrant), cert. denied 556 U.S. 1200 (2009). Song Ja Cha is not to the contrary; there, the Ninth Circuit held that the warrant issued after a 26.5-hour impoundment constituted an independent source but nonetheless suppressed evidence obtained pursuant to the warrant as a direct result of Fourth Amendment violations where officers' conduct was deliberate, culpable, and systemic. See 597 F.3d at 1003-06.

apartment because they believed that minors in the apartment required immediate protection, not because they sought confirmation that applying for a search warrant would yield incriminating evidence. Moreover, the Court finds inconceivable the notion that officers, after reviewing the Kik messages and videos depicting child pornography, and having what they believed was reliable information about the perpetrator and his location, would not seek a search warrant. See Sable, 633 F.3d at 245.

The Court is also persuaded that the second requirement of Murray is satisfied. Hernandez does not contend that the Warrant Affidavit included any information derived from the NYPD's allegedly unlawful entry or its unlawful impoundment of his apartment. And, for reasons discussed infra in Section III.D.2.b, the information the Warrant Affidavit contained provided the magistrate with "a substantial basis for concluding" that there was a "fair probability that contraband or evidence of a crime w[ould] be found" in Hernandez's apartment. Illinois v. Gates, 462 U.S. at 238-39 (quotations, citations, and alterations omitted).

For these reasons, the Court concludes that application of the independent source doctrine under the factual circumstances presented here is appropriate. Doing

88

so in this case will neither allow law enforcement to "profit from its illegal activity" nor "place[] [law enforcement] in a worse position" than it would have been in absent its unlawful conduct. Murray, 487 U.S. at 542.[28]

    2.   Franks v. Delaware

Hernandez also asserts that all evidence the Government collected pursuant to the Warrant should be suppressed under Franks v. Delaware, 438 U.S. 154 (1978), because agents procured the Warrant with a deliberately false and misleading affidavit.

Warrants are generally supported by affidavits, which are sworn to by the affiant. If, after an evidentiary hearing, a defendant establishes by a preponderance of the evidence (1) that the affiant made false statements or omissions "knowingly and intentionally, or with reckless disregard for the truth," and (2) that the misstatements or omissions were material, the Court must void the search warrant and suppress "the fruits of the search . . . to the

---

[28] Even if, as Hernandez requests, the Court required the Government to show that the evidence obtained pursuant to the search warrant inevitably would have been discovered but for the NYPD's unlawful actions, the Court would conclude that the Government had made such a showing. Had the officers not entered and impounded the apartment, Hernandez would still have been in lawful custody, and Ms. Hernandez would have been alone in the apartment. For the same reasons the Court concluded that the need to prevent evidence destruction did not justify the impoundment, the Court concludes that Ms. Hernandez would not have intentionally destroyed or removed evidence. Nor does the record suggest that she might have done so unintentionally. She testified that she went into Hernandez's room every day to clean it but never used his computer or phones. Jan. 7 Tr. 32:14-33:9.

same extent as if probable cause was lacking on the face of the affidavit." <u>Franks</u>, 438 U.S. at 155-56; <u>United States v. Ferguson</u>, 758 F.2d 843, 848 (2d Cir. 1985) ("Omissions from an affidavit that are claimed to be material are governed by the same rules.").

Whether the affiant "acted deliberately or recklessly is a factual question of intent . . . ." <u>United States v. Trzaska</u>, 111 F.3d 1019, 1028 (2d Cir. 1997). Negligence and innocent mistakes or misunderstandings do not constitute deliberate or reckless disregard for the truth. <u>Franks</u>, 438 U.S. at 171; <u>Trzaska</u>, 111 F.3d at 1028. The relevant question is "whether the [affiant] in fact entertained serious doubts as to the truth of the subject statements" or had "obvious reasons" to doubt their veracity. <u>United States v. Kunen</u>, 323 F. Supp. 2d 390, 394 (E.D.N.Y. 2004) (citations omitted). With regard to omissions, "[r]ecklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." <u>Rivera v. United States</u>, 928 F.2d 592, 604 (2d Cir. 1991).

To determine whether misstatements or omissions are material, the Court must revise the affidavit, by adding alleged omissions and disregarding allegedly false statements, and then assess whether the corrected affidavit

supports a finding of probable cause. <u>United States v. Awadallah</u>, 349 F.3d 42, 65 (2d Cir. 2003) (citations omitted).[29] "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." <u>United States v. Martin</u>, 426 F.3d 68, 73-74 (2d Cir. 2005) (quotations and citations omitted).

Probable cause "is a fluid concept" that is not "readily, or even usefully, reduced to a neat set of legal rules." <u>Gates</u>, 462 U.S. at 231. Rather, determining whether probable cause exists requires the Court to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Martin</u>, 426 F.3d at

---

[29] The Second Circuit has explained that, when assessing the materiality of affirmatively false or misleading statements, courts must strike such statements from the affidavit and not allow the Government to introduce facts which were known at the time but not included in the affidavit. <u>See United States v. Falso</u>, 544 F.3d 110, 127 & n.22 (2d Cir. 2008) (assessing whether a corrected affidavit supported probable cause and explaining that the Government cannot rely on "additional information that was not reflected in the affidavit"); <u>Awadallah</u>, 349 F.3d at 70 n.22 (holding that "related facts," which the Government knew when it sought the warrant but did not include in the affidavit, "lie outside the scope of a proper *Franks* inquiry because the relevant question is whether the *remaining portions* of the affidavit give rise to probable cause.")(quotations and citations omitted); <u>see also United States v. Harris</u>, 464 F.3d at 738, 739 (7th Cir. 2006) (explaining that the lower court's "consideration of new information omitted from the warrant affidavit should have been limited to facts that did not support a finding of probable cause").

74 (quoting <u>Gates</u>, 462 U.S. at 213). When an affidavit presents information from a confidential informant, the Court assesses whether probable cause exists by considering the "totality of the circumstances," including the "informant's veracity, reliability and basis of knowledge,' and the extent to which an informant's statements . . . are independently corroborated." <u>McColley</u>, 740 F.3d at 823.

Hernandez identifies six categories of false statements and omissions in the Warrant Affidavit. The Court first determines whether any of these statements and omissions were made deliberately or recklessly and then considers a corrected affidavit to assess whether any such statements or omissions were material to the magistrate's probable cause finding.

   a.   <u>Intentional   or   Reckless   Misstatements   or Omissions</u>

First, Hernandez is "clearly correct" that the Warrant Affidavit should have included that Witness-1 was a paid confidential informant and should have provided information about her reliability, criminal history, pending charges, and ongoing criminal activity. <u>United States v. Williams</u>, 758 F. Supp. 2d 287, 304 (S.D.N.Y. 2010), <u>rev'd on other grounds</u>, 681 F. 3d 35 (2d Cir. 2012). For the purposes of analysis, the Court assumes, without deciding, that the law

enforcement agents' omission of such information was reckless and assesses its materiality in the following section.

Second, Hernandez has not established by a preponderance of the evidence that Adamczyk deliberately or recklessly made statements incorrectly indicating that the informant knew Hernandez's name and apartment number.[30] At the hearing, Lofaro, Adamczyk, and Mortazavi could not recall Lofaro mentioning these gaps in the informant's knowledge on November 7 and 8. Lofaro did inform Adamczyk about Noh's social media and law enforcement database searches. But the record does not indicate that Lofaro clearly explained the significance of those searches -- namely, that they did not corroborate the informant's story but instead supplied information she did not know. While Adamczyk likely could have elicited this explanation from Lofaro, the record does not indicate that she deliberately

---

[30] The Government argues that these statements are not misleading and merely reflect a standard drafting convention used in Warrant Affidavits. The Court is not persuaded. The statements read as paraphrases of statements the informant made to the NYPD. See e.g., Warrant Aff. ¶ 11(a) ("Witness-1 reported to law enforcement that ABRAHAM HERNANDEZ lives at [a particular address, including an apartment number].); id. ¶ 12 ("Witness-1 reported to a New York City Police Department ("NYPD") precinct that Witness-1 had received the videos from ABRAHAM HERNANDEZ."). As Mortazavi acknowledged, she should have drafted the Warrant Affidavit and November 8 Complaint to say the informant reported that someone "later identified as" the defendant sent her child pornography. Nov. 26 Tr. 116:5-10.

or recklessly avoided learning information adverse to a finding of probable cause.

The team's decision to have Adamczyk, rather than Lofaro, swear out the Warrant Affidavit -- and to have Mortazavi draft it -- were perhaps misguided and facilitated inaccuracies. See United States v. Trzaska, 111 F.3d 1019, 1028 (2d Cir. 1997) ("We . . . agree that the person preparing the affidavit should have had at least some personal knowledge of what transpired.") Nonetheless, the Court finds Lofaro's and Adamczyk's testimony regarding their discussions on November 7 and 8 to be credible. The Court accordingly concludes that the misstatements regarding the informant's knowledge of the Kik user's name and apartment number reflect misunderstandings and mistakes made as the team hastily prepared the Warrant Affidavit on November 8. See id. (affirming district court's determination that statements resulting from "mistakes and misunderstandings" that occurred when a probation officer conveyed information from a witness to an affiant did not rise to the level of recklessness).[31] The federal agents'

---

[31] Regardless, statements indicating that the informant knew the Kik user's apartment number, as opposed to his street address, were not material to the magistrate's determination of probable cause. If the apartment number was stricken from the hypothetical corrected affidavit, the corrected affidavit would state that the informant provided the Kik User's street address. Like the original affidavit, the corrected affidavit would explain that Adamczyk "conducted a

rushed actions in seeking to obtain the warrant on November 8, after having learned about the potential unlawful conduct only the day before, and given the serious evidence of child pornography they had been shown, arguably gave rise to instances of negligence in part occasioned by pressure from the exigency the law enforcement agents perceived, perhaps exacerbated by their relative inexperience. Under the particular circumstances presented here, however, the Court is not persuaded that the officers' conduct crossed the line into deliberately or recklessly knowing misbehavior.

Third, Hernandez also has not shown that Adamczyk represented that the informant had "known [Hernandez] for approximately one year" and "engaged in sexual acts with [him] multiple times," while knowing these claims to be false or with reckless disregard for their truth. Warrant Aff. ¶ 12. The record indicates that Adamczyk did not have reason to doubt these statements until November 27, 2018, when she met with the informant. As of November 8, the statements, in the Court's assessment of the evidence and the credibility of the witnesses, appeared believable in

---

database check  . . . for the name "'Abraham Hernandez' and the location 'New York,'" which returned three results, all of which were associated with the same unit in the building that the informant identified. Warrant Aff. ¶ 11(b). Based on this information, there was a fair probability that Hernandez resided in the unit that Adamczyk's searches identified.

light of the Kik messages. In those messages, the Kik user and informant used terms of endearment and contemplated future sexual encounters with one another.

That the Armanixprincex Kik Account was not registered until June 2018 did not provide an obvious reason to doubt the informant's claim that she had known the Kik user for a year. The informant's exchange with the Kik user regarding his MeetMe profile indicated that the two previously corresponded using other social media applications. That the informant did not volunteer information about any prior sexual encounter with Hernandez when making her formal identification of him is unsurprising and also does not cast these claims into doubt. Because the record does not indicate that the NYPD asked her to provide more information than she did -- a one-sentence identification of Hernandez as the person who sent her child pornography -- the Court cannot draw any adverse inferences from her omissions.

Fourth, the Court is also not persuaded that Adamczyk knowingly or recklessly misrepresented that the informant recognized the Kik user's apartment in the background of certain child pornography videos. Lofaro confirmed that the informant told him she recognized the apartment in the videos, and he conveyed this information to Adamczyk.

Consistent with the informant's claim, the Kik messages exchanged between the Kik user and the informant implied that the informant knew the Kik user's address. Adamczyk reasonably decided not to ask NYPD officers who had been or were present in the Hernandez apartment to confirm whether they had seen a room similar to the one featured in the videos. As the NYPD had entered without a warrant, she had reason to believe a court might deem their actions unlawful, and unlawfully obtained evidence "should not be included in a warrant affidavit." Trzaska, 111 F.3d at 1026 (citations omitted).[32]

Even if she believed the NYPD was lawfully securing the apartment, Adamczyk could reasonably have believed it improper to ask them to investigate the bedroom. See United States v. Madrid, 152 F.3d 1034, 1039-40 (8th Cir. 1998) (suppressing evidence obtained pursuant to a warrant because officers securing a home pending issuance of the warrant "exploited their presence," including by "search[ing] mail and a notebook" and "wander[ing] through [the] house") (quotations and citations omitted). Indeed,

---

[32] That the final Warrant Affidavit omitted an earlier draft's references to "conversations with law enforcement agents who arrested HERNANDEZ" as supporting a belief that child pornography videos were "filmed in HERNANDEZ's apartment" makes no difference. Def.'s Ex. 3506-24. Given the reasonable legal concerns associated with including such a statement in the Warrant Affidavit, the Court cannot infer that Mortazavi and Adamczyk deleted these statements from the final draft because NYPD officers told them that the videos could not have been produced in the apartment.

that Mortazavi was consulting with her superiors and someone from the Appeals Unit of the U.S. Attorney's Office on November 8 suggests that, despite the fast pace of the investigation, she was attempting to spot and address or avoid such legal issues.[33]

Fifth, Hernandez challenges as deliberately or recklessly misleading the inclusion of the following paragraph in the November 8 Complaint, which was incorporated by reference in the Warrant Affidavit:

> Based on information obtained pursuant to a subpoena issued to Kik for Internet Protocol ("IP") connection logs associated with "Armanixprincex" I collected IP addresses associated with "Armanixprincex" indicating that on or about November 4, 2018, through on or about November 7, 2018, the period in which the aforementioned communications occurred, ABRAHAM HERNANDEZ, the defendant, accessed and communicated using the Kik online application from the Bronx, New York.

Nov. 8 Compl. ¶ 6. Hernandez argues that this paragraph misleadingly suggested that the IP address logs provided information linking the Armanixprincex Kik account

---

[33] Regardless, the statement that the informant recognized the background of the videos was not material to the magistrate's probable cause finding. Other information in the affidavit supported an inference that evidence of the possession and production of child pornography would be found in Hernandez's home. See e.g., Warrant Aff. ¶ 12 ("Based on my training and experience and conversations that I have had with other law enforcement officers, I know that . . . individuals who wish to obtain child pornography usually do so by ordering it from abroad or by discreet contact with other individuals who have it available, including through the use of the Internet in their homes or private locations . . . ."); see Raymonda, 780 F.3d at 114-115 (recognizing that a collector of child pornography is likely to retain such content "in the privacy of [his] home.").

to Hernandez, when they in fact contained no such identifying information. The Court is not persuaded. The paragraph above does not affirmatively represent, or even imply, that the IP address logs contained information identifying the Armanixprincex account as belonging to Hernandez. Reflecting the manner in which complaints are commonly drafted, the paragraph appears to suggest an inference by building upon the allegation in a preceding paragraph that Hernandez used the Armanixprincex Kik account.[34] Nor does the record support a conclusion that Adamczyk recklessly omitted mentioning that the Armanixprincex Kik account was first registered in June 2018. For reasons discussed above, this information was not "clearly critical" to probable cause such that recklessness may be inferred from its omission. See Rivera, 928 F.2d at 604.

---

[34] Even assuming the reference to Hernandez in this paragraph was false and recklessly made, it would not have been material to the magistrate's probable cause determination. If the Court struck this entire paragraph from the November 8 Complaint, the corrected affidavit would include that the informant, who had known the Kik user for approximately one year, provided the Kik user's street address and name and that Adamczyk's database searches, using the terms "Abraham Hernandez" and "New York," identified a unit, in the building the informant identified, that was associated with Abraham Hernandez. These statements would support an inference that the informant learned the Kik User's building address within the last year, such that the address information would not have been stale. Additionally, in the Section of the Warrant Affidavit describing the "Subject Premises," Adamczyk stated she had "spoken with a law enforcement officer who ha[d] personally seen [the apartment] to effectuate the arrest of ABRAHAM HERNANDEZ by the [NYPD]." Warrant Aff. ¶ 7.

Finally, Hernandez alleges that the Warrant Affidavit misleadingly omitted information about the NYPD's investigation, including that: the NYPD entered Hernandez's apartment; seized two phones; saw no minor in the apartment or any signs of Hernandez's sister; otherwise failed to corroborate the informant's story; and remained present in the apartment. When Adamczyk swore out the Warrant Affidavit, she knew that the NYPD had entered the apartment, seized two phones, arrested Hernandez, and remained inside the apartment. She must also have known that the NYPD found no minors in the apartment. But, as discussed above, it was not reckless for her to omit information obtained through arguably unlawful actions by the NYPD. Nor was the omitted information so critical to probable cause that recklessness may be inferred from its omission.[35] See Rivera, 928 F.2d at 604; see also McColley,

---

[35] Adding to the corrected affidavit the allegedly omitted information concerning the NYPD's investigation, including how it failed to corroborate the informant's tip, would not eliminate the fair probability that evidence of the production and possession of child pornography would be found at the apartment. First, even though the NYPD seized two phones, agents could be expected to find child pornography on, for example, any computers or flash drives in the apartment or any older, retired phones that Hernandez may have retained. See Warrant Aff. ¶ 17 (describing how collectors of child pornography frequently store child pornography). Additionally, the likelihood of identifying evidence of the possession and production of child pornography was not a function of whether the defendant, in fact, had an underage biological sister who resided in his apartment. Although, as reflected in the November 8 Complaint, the Kik user referred to the 13-year-old as his "sis['s] friend" he conceivably could have been speaking about the friend of a non-relative who he thought of and referred to as a sister. Similarly, that Ms. Hernandez

740 F.3d at 823 (explaining that the affiant need not
"volunteer every fact that arguably cuts against the
existence of probable cause" as long as she does "not omit
circumstances that are critical to its evaluation")
(quotations and citations omitted).

     b.   The Corrected Affidavit

     As noted above, for the purposes of analysis the Court
assumes, without deciding, that Adamczyk recklessly omitted
that the person identified in the Warrant Affidavit as
Witness-1 was, in fact, a paid criminal informant and that
she recklessly omitted information regarding the
informant's reliability, criminal history, pending charges,
and ongoing criminal activity. Under this assumption, a
corrected affidavit would state that Witness-1 was a
confidential informant who would be paid for providing
information. It would detail that the informant worked as a
prostitute and had a string of convictions, arrests, and
complaints against her for offenses involving prostitution,
marijuana, assault, grand larceny, harassment, and
aggravated harassment. It would also note that, at the

was present at the apartment when the NYPD arrived and denied
recognizing the minors in photos from the videos did not meaningfully
reduce the probability that Hernandez retained child pornography in the
apartment or had produced such material when Ms. Hernandez was not
present. Nor would the fact of the NYPD's initial entry, arrest of
Hernandez, and ongoing presence in the apartment have reduced the
likelihood of evidence being found in the apartment.

time, the informant had eight pending cases that she hoped to resolve. It would further disclose that the informant had recently been registered by the NYPD and had no record of reliability.

The corrected affidavit would also include the information provided in the original Warrant Affidavit, including: that the informant reported to the NYPD that Hernandez sent her child pornography using the Armanixprincex Kik account and provided his address to the NYPD; that Adamczyk conducted searches indicating that Hernandez indeed lived at that address; that the informant reported that she had known Hernandez for approximately one year, engaged in sexual acts with him multiple times, and had seen his apartment; that Adamczyk reviewed the messages and videos sent by Hernandez to the informant and found that five of the videos depicted minors engaged in sexually explicit acts and one video depicted Hernandez masturbating; and that, based on her training experience and conversations with other law enforcement officers, Adamczyk knows that individuals who wish to obtain child pornography often do so using the internet and email in their homes or other private locations, that collectors of child pornography typically keep such materials for many years and often maintain lists of contact information for

other individuals who share their interest in child pornography, and that collectors of child pornography frequently view such materials in various forms and store such materials on various devices ranging from disk drives and thumb drives to mobile phones, digital cameras, and computers.

The corrected affidavit, like the original Warrant Affidavit, would incorporate the November 8 Complaint, which included quotes from Kik messages sent by Armanixprincex indicating that the videos he sent depicted him engaging in sexually explicit acts with a 13-year-old friend of his sister and that he could arrange for the informant to engage in sexual activities with her. The November 8 Complaint also indicated that IP connection logs associated with the Armanixprincex Kik account indicated the account was accessed from the Bronx in early November, 2018.

On the basis of the information described above, Adamczyk's affidavit as corrected supports a finding of probable cause for Hernandez's arrest and the search and seizure at his residence. For substantially the same reasons discussed above in Section III.A.2.a., the disclosure of additional information concerning the informant's background and characteristics does "not

undermine the central facts establishing the [confidential informant's] reliability . . . ." Williams, 758 F. Supp. 2d at 304. See Gagnon, 373 F.3d at 236 ("[I]t is improper to discount the information provided simply because the informant has no proven record of truthfulness or accuracy.") (quotations, alterations, and citations omitted). The informant spoke face-to-face with Lofaro and turned over the Kik conversation -- in which the informant requested and received child pornography -- even though, by doing so, she subjected herself to potential criminal prosecution. See United States v. Harris, 403 U.S. at 583-84 ("That the informant may be paid or promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct."); Gagnon, 373 F.3d at 236 (explaining that an informant's willingness to meet with law enforcement in person tends to indicate credibility).

The corrected affidavit would show that the informant's basis of knowledge for claiming that the Kik user was producing and distributing child pornography was strong: the Kik user's own assertions and videos he sent to the informant. By quoting and describing the Kik messages and videos, the corrected affidavit left no doubt as to whether the Kik user actually made those admissions. The

corrected affidavit also set forth the informant's basis for believing the Armanixprincex Kik user to be Hernandez: use of the Armanixprincex Kik account to send a video of Hernandez that persons other than Hernandez would not likely possess.

Adamczyk's database searches confirmed that Hernandez was associated with the address the informant identified as his. The corrected affidavit also indicated that this address information remained current. The corrected affidavit would support an inference that the informant learned Hernandez's address within approximately the last 12 months, and the IP address logs indicated that the Armanixprincex Kik account was accessed from the Bronx within the week before November 7, 2018. Taking into account that in this case the investigation that ultimately led to Hernandez's arrest and search of his home were actually commenced by the informant volunteering a tip about crime information to NYPD officers, it would be highly improbable that the totality of all of the events the informant described pointing convincingly to criminal conduct implicating Hernandez had instead a purely innocent and coincidental explanation. It would also defy applicable legal doctrine and common sense if such a combination of circumstances would not suffice to support a reasonable

decision by a magistrate judge that the probable cause standard to issue a search warrant had been satisfied.

Thus, the Court concludes that the corrected affidavit provides probable cause to believe that Hernandez produced and possessed child pornography and that evidence of these crimes would be found in his apartment. The Court accordingly holds that application of <u>Franks</u> does not require suppression of evidence obtained pursuant to the Warrant at issue here.

### 3. Overbreadth

Hernandez argues that evidence obtained pursuant to the Warrant must also be suppressed because the Warrant was unconstitutionally overbroad. Specifically, Hernandez argues that the Warrant was overbroad because: (1) it was not limited to electronic devices belonging to Hernandez, as opposed to his mother, and (2) it permitted seizure of devices that did not support the Kik messaging app.

Under the Fourth Amendment, warrants must describe with particularity "the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. This purpose of this requirement is to "to prevent . . . general, exploratory rummaging in a person's belongings and the attendant privacy violation." <u>United States v. Galpin</u>, 720 F.3d 436, 445 (2d Cir. 2013) (quotations and citations

omitted). To meet this particularity requirement, a warrant must (1) specify the offense(s) for which law enforcement established probable cause, (2) "describe the place to be searched," and (3) "specify the items to be seized by their relation to designated crimes." Id. at 445-446. A warrant is overbroad if its "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." Id. at 446 (quoting 2 W. LaFave, Search & Seizure § 4.6(a) (5th ed. 2012)); see id. at 448 (holding that warrant authorizing agents to search for images depicting child pornography was overbroad where warrant did not provide probable cause to believe the defendant possessed or produced child pornography).

Although in the Second Circuit "there is no settled formula for determining whether a warrant lacks particularity," district courts in this Circuit have observed that:

> [T]wo factors, above others, tend to define a warrant's insufficient particularity. First, warrants are generally found to be insufficiently particular where nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken. Second, warrants will frequently lack particularity where they include a general, catch-all paragraph or provision, often one authorizing the seizure of any or all records of a particular type.

United States v. Zemlyansky, 945 F. Supp. 2d 438, 453
(S.D.N.Y. 2013) (quotations and citations omitted).

   a.   Limitations by Crime

   The Court first addresses Hernandez's argument that
the Warrant was overbroad because it permitted seizure of
devices belonging to Ms. Hernandez. The relevant question
is not whether the Warrant Affidavit provided probable
cause to believe Ms. Hernandez committed a crime. Rather,
the question is whether the Warrant Affidavit provided
probable cause to believe evidence of a crime would be
found on the devices that the Warrant authorized to be
searched and seized, even though the Warrant did not
expressly limit the category of devices to be seized to
those owned by Hernandez.

   Here, the Warrant was supported by probable cause to
believe Hernandez sexually exploited a child to produce
child pornography and possessed and distributed child
pornography. The Warrant limited the "[c]omputer devices,
storage media, and related electronic equipment" to be
searched and seized to those "that may contain or
constitute fruits, evidence, and/or instrumentalities" of
the "sexual exploitation of a child, possession, receipt,
and distribution of child pornography," or attempt to do
the same, in violation of Title 18, United States Code,

2252A(2)(B),  (a)(5)(B),  (b)(1),  (b)(2),  and  (2).  See
Warrant, Attachment A.[36] The Warrant also contained a
protocol governing the review of electronically stored
information on any devices, which required officers to
"make reasonable efforts to search only for files,
documents, or other electronically stored information"
pertaining to those offenses. Id. Thus, the Warrant
appropriately limited the devices and electronically stored
information to be searched and seized in relation to
specified crimes for which the Government established
probable cause. See Zemlyansky, 945 F. Supp. 2d at 455-57
(collecting cases); United States v. Campos, 221 F.3d 1143,
1147 (10th Cir. 2000) (upholding warrant authorizing
seizure of computer equipment "which may be, or [is] used
to visually depict child pornography"); cf. United States
v. Rosa, 626 F.3d 56, 62 (2d Cir. 2010), cert. denied, 565
U.S. 1236 (2012) (holding that a warrant was overbroad
where it did not limit the devices to be searched and
seized to "any and all electronic equipment potentially
used in connection with the production or storage of child
pornography").

---

[36] Other categories of things to be seized were similarly limited. See
Warrant, Attachment A.

The Court is not persuaded that the Warrant was overbroad because it did not additionally restrict the devices subject to search and seizure to those identified as belonging to Hernandez. As the Government rightly points out, agents executing warrants to search and seize electronic devices in multi-person dwellings would confront substantial practical difficulties if warrants limited the list of electronic devices to be searched and seized to those owned or used by a particular person. Agents often cannot determine which individuals have accessed an electronic device without seizing and searching it. Accord Galpin, 720 F.3d 436 ("[I]n the digital realm, . . . the size or other outwardly visible characteristics of a file may disclose nothing about its content."). And whether a device is within the scope of the warrant surely cannot turn on the occupants' representations regarding its ownership. See United States v. Canestri, 518 F.2d 269, 273 (2d Cir. 1975) (holding that a room should not be excluded from the scope of a search warrant based on an occupant's representation that the "room[] . . . 'belongs' to a party not named in the warrant" because concluding otherwise would allow occupants to "frustrat[e]" the "purpose of a search warrant by . . . mere declaration").

The Court declines to interpret the particularity requirement as imposing an infeasible or impractical requirement. Indeed, the Second Circuit has explained that Courts "may tolerate some ambiguity in the warrant so long as law enforcement agents have . . . describe[d] the items to be seized with as much particularity as the circumstances reasonably allow." Galpin, 720 F.3d at 446.

Although the Warrant may have permitted seizure of electronic devices that did not actually contain evidence of a crime, that does not mean the Warrant was overbroad. Even "traditional searches for paper records, like searches for electronic records, have always entailed the exposure of records that are not the objects of the search to at least superficial examination in order to identify and seize those records that are." United States v. Ulbrecht, 858 F.3d 71, 100 (2017), abrogated on other grounds by, Carpenter, 138 S. Ct. 2206.

   b.   The Scope of the Electronic Device Category

Hernandez argues that the Warrant authorized an excessively broad category of electronic devices to be seized. He asserts that the scope of the electronic device category should have been limited to devices that support the Kik application because the Warrant Affidavit did not

provide probable cause to believe Hernandez was a collector of child pornography.

As discussed above, courts infer that a suspect is a "collector of child pornography, likely to hoard illicit images" where "circumstances suggest[] that [the suspect] accessed those images willfully and deliberately, actively seeking them out to satisfy a preexisting predilection." Raymonda, 780 F.3d at 114-115. The inquiry focuses not on the number of images the suspect is known to possess but on whether the circumstances indicate he willfully accessed the images. See id. (explaining that even a defendant who accessed only "a single file of child pornography" may be deemed a collector if he "subsequently redistributed that file to other users") (citations omitted).

The Warrant Affidavit provides probable cause to believe that Hernandez accessed, viewed, and sent five videos containing child pornography in Kik messages to the informant. Moreover, it provides probable cause to believe that he produced these videos by sexually abusing a minor. These actions, as recorded on his own social media accounts and in his own words and images, involve actively seeking out and deliberately accessing, viewing, and distributing child pornography. The Warrant Affidavit accordingly provides probable cause to believe Hernandez was a

collector of child pornography and likely to retain such images "in the privacy of [his] home." Id. at 114. The Warrant Affidavit also described the methods through which collectors of child pornography commonly obtain, access, store, and distribute child pornography.

Because the Warrant was supported by probable cause to believe Hernandez was a collector of child pornography, the Court is not persuaded that the Warrant authorized an excessively broad category of electronic devices to be seized.

4.   Duty to Correct

Hernandez argues that agents executed the Warrant in two stages: first, agents seized, or copied data from, electronic devices on November 8, and, second, agents reviewed this data sometime after November 28. No witness could testify as to when the agents searched and reviewed the electronically stored information. The facts, however, support the inference that agents reviewed the data sometime after the Government dismissed the original complaint on November 28, 2018 and before the Government filed new charges on January 22, 2019.

Relying on United States v. Marin-Buitrago, 734 F.2d 889 (2d Cir. 1984), Hernandez asks the Court to suppress evidence seized during the execution of the Warrant but not

searched until after November 28 on the grounds that Mortazavi and Adamczyk had, by that time, learned adverse facts material to a finding of probable cause.

In Marin-Buitrago, the Second Circuit confirmed that "when a definite and material change . . . occur[s] in the facts underlying the magistrate's determination of probable cause" after issuance of a warrant but before execution of the warrant, the magistrate "must be made aware of any material new or correcting information" so that the magistrate may "determine whether probable cause still exists." Id. at 894. In that case, the Second Circuit held that the new information learned between issuance and execution of the warrant was not material to probable cause, and, accordingly, that the warrant was supported by probable cause when it was executed, rendering suppression unwarranted. Id. at 894-96.

Neither party has identified a case in which a court applied Marin-Buitrago to the off-site review of electronically stored information subsequent to its seizure, suggesting that Marin-Buitrago's application in this context is potentially novel. The Government does not dispute the existence of a duty to correct but argues that Marin-Buitrago is inapposite because, based on Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the

Court must conclude that agents fully executed the Warrant on November 8, 2018 and, after that date, had no duty to correct information previously provided to the magistrate.

The Court is not persuaded that Rule 41(e)(2)(B) forecloses Hernandez's argument. Rule 41(e)(2)(B) concerns warrants that "authorize the seizure of electronic storage media or the seizure or copying of electronically stored information." Fed. R. Crim. P. 41(e)(2)(B). The rule contemplates that agents will not review the media or information until sometime after its seizure. Indeed, the Rule provides that, "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." Id. While recognizing the potential lapse of time between the seizure and review of data, Rule 41(e)(2)(B) nonetheless provides that the "time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Id. As the 2009 Advisory Committee Notes explain, the purpose of Rule 41(e)(2)(B) is to exempt the review of electronically stored information seized pursuant to a warrant from the 14-day time limit within which a warrant must be executed. See United States v. Alston, No. 15 CR 435, 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016).

But, contrary to the Government's contention, this exemption does not authorize agents to review electronically stored information regardless of how much time has passed, or what events have transpired, since the issuance of the warrant. See id. Rather, the rule reflects the Advisory Committee's view that "there is no basis for a 'one size fits all' presumptive period" within which electronically stored information must be reviewed. Id. (quoting Fed. R. Crim. P. 42(e)(2)(B), 2009 Advisory Committee Notes). Courts recognize that, despite the absence of a bright-line rule, "off-site copying or review" remains "subject to the rule of reasonableness." Id. (citations omitted). And "delay . . . that results in the lapse of probable cause" is "unreasonable." Marin-Buitrago, 734 F.3d at 894; see United States v. Aboshady, 951 F.3d 1, 7 (1st Cir. 2020) (citing Marin-Buitrago and holding that delayed review of digital information seized pursuant to a warrant was not unreasonable where "there is no evidence in the record here that suffices to show that probable cause had lapsed at the time that any particular search of the data may have been conducted").

The Court must therefore assess the reasonableness of agents' subsequent off-site review of electronically stored information. Under Marin-Buitrago, determining whether

investigators breached their duty to report new information to the magistrate requires the Court to assess the materiality of the new information. See 734 F.2d at 894 ("The duty to report new or correcting information to the magistrate does not arise unless the information is material to the magistrate's determination of probable cause"). The relevant question is whether, after "the addition of the new information" to "the information in the [original] affidavit," probable cause continued to exist. Id. at 895.[37]

As detailed above, most of the information law enforcement obtained by November 28 was not material to the magistrate's probable cause finding. See supra Sections III.D.2.a and III.D.2.b. The information that law enforcement knew as of November 28 but that the Court has not yet deemed immaterial consists of the following: (1) the informant had purportedly forgotten the Kik account name of the person who sent her the child pornography videos and had deleted all the Kik messages between herself and the Kik user; (2) the informant did not know the Kik user's legal name when she provided the tip but identified him based on a picture and learned his name from law

---

[37] This test differs significantly from the Franks analysis in that it involves no assessment of subjective intent.

enforcement; (3) the informant met Hernandez in person only once, approximately 18 months prior to providing the tip; and (4) the child pornography videos sent via Kik were not made in Hernandez's apartment.

The Court concludes that, taking into consideration all the new information along with the information contained in the original Warrant Affidavit, investigators had probable cause to believe evidence of child pornography offenses would be found in the electronically stored information seized from Hernandez's home. First, that the informant had purportedly forgotten Hernandez's Kik username is not material since the Warrant Affidavit incorporated the November 8 Complaint in which Adamczyk stated that she knew, based on her own review of the messages, that Armanixprincex sent the messages. The informant's deletion of the Kik messages from her phone also is not material. She had provided the contents of the messages to the NYPD and, had she not deleted them, she would have been in possession of child pornography. To the extent these new facts would have raised concerns regarding the informant's credibility, the corroboration of her account provided by Adamczyk's database searches and review of the messages and videos the informant received would offset such concerns.

Second, that the informant did not know Armanixprincex's legal name but rather identified him based on a picture and learned his name from law enforcement would not have defeated a finding of probable cause. The informant identified Armanixprincex as a person living at a particular street address and identified Hernandez as Armanixprincex based on a photograph. Adamczyk's database searches confirmed that Hernandez lived at the address the informant provided and thereby corroborated the informant's identification of Hernandez as Armanixprincex.

Third, that the informant had sex with Hernandez only once approximately 18 months prior and that this was the only occasion on which she saw his apartment would not be material. This change in the timeline does not render the address information stale. The Warrant Affidavit stated that Adamczyk corroborated the address, and the IP address collection logs, described in the November 8 Complaint, confirmed that the user of the Armanixprincex Kik account recently accessed it from the Bronx. Additionally, in the Section of the Warrant Affidavit describing the "Subject Premises," Adamczyk stated she had "spoken with a law enforcement officer who ha[d] personally seen [the apartment] to effectuate the arrest of ABRAHAM HERNANDEZ by the [NYPD]." Warrant Aff. ¶ 7. Even if this updated

timeline would have cast doubt on the informant's ability to recognize Hernandez, Adamczyk's database searches corroborated the informant's identification of Hernandez.

Finally, that agents knew the child pornography videos were not produced in Hernandez's apartment did not defeat a finding of probable cause to believe that evidence would be found in the electronically stored information seized from Hernandez's home. The Kik messages quoted in the November 8 Complaint, incorporated in the original Warrant Affidavit, quoted messages in which Armanixprincex represented that he had produced the child pornography videos. The messages, as described in the November 8 Complaint, also indicated that Hernandez had willfully accessed, viewed, and distributed child pornography. Even if probable cause to believe Hernandez produced child pornography would have been lacking, the updated information would have provided probable cause to believe that Hernandez accessed, possessed, and distributed child pornography and, moreover, was a collector of child pornography. See Raymonda, 780 F.3d at 114-115.

For these reasons, the Court concludes that, "[e]ven with the supplemental information, the affidavit clearly establishes, by a fair probability, that evidence" pertaining to child pornography offenses would be found in

120

the electronically stored information seized from
Hernandez's home. Marin-Buitrago, 734 F.2d at 896. The
Court accordingly declines to suppress evidence seized
during the execution of the Warrant but not searched until
after November 28, 2018. See id.

## IV.   ORDER

For the above reasons, it is hereby

**ORDERED** that the motion to suppress (Dkt. No. 14) of
defendant Abraham Hernandez is **DENIED**.

**SO ORDERED.**

Dated:    New York, New York
          16 June 2020

_____
Victor Marrero
U.S.D.J.